**TRENTON INDUSTRIES, Plaintiff,**

v.

**A. E. PETERSON MANUFACTURING CO., Defendant.**

**Civ. No. 18935.**

United States District Court
S. D. California.

Sept. 12, 1958.

Robert Douglas Lyon, Los Angeles, Cal., for plaintiff.

Warren T. Jessup, Los Angeles, Cal., for defendant.

HOLTZOFF, District Judge.

This is the trial of an action to recover compensation for the use of a patented invention involving an improvement in high chairs intended for the use of infants. The complaint in its present form consists of two counts. The first count asserts a claim for infringement of the patent, and is in the customary form of complaints in patent infringement suits. The second count sounds in quasi-contract and seeks to recover compensation for the use of the patented device during the period prior to the issuance of the patent.

This claim is based on the contention that the plaintiff caused information concerning the invention to be communicated to the defendant with the view to authorizing the defendant to manufacture the invention on a royalty basis, or some other arrangement for compensation, and that the defendant appropriated and used the idea but declined to pay any compensation therefor. Recovery is sought un-

der Count 2 on the theory of unjust enrichment.

Each of the two counts is entirely independent of the other. Each is based on different principles of law, and founded on different states of facts. Accordingly, the court will deal with each of them separately and decide each separately.

The first count deals with infringement of the patent issued to John Adler and Dale O. Adler on an application filed September 18, 1953, serial number 380,-991. Patent No. 2,699,817 was granted on this application on January 18, 1955, and was assigned to the plaintiff corporation, which is a concern controlled by the inventor John Adler. The defenses are, first, that the patent is invalid; and, second, that if it is valid, it has not been infringed.

John Adler was active in the manufacture of furniture of various types, among them, high chairs intended for the use of babies. He endeavored to develop a high chair that would easily fold and collapse, and when so folded would make a compact and short package that could be easily shipped, as well as handled with facility by the customer who bought the chair. He experimented with high chairs for some time and finally developed the chair on which the patent claims involved in this case were granted.

In general, the plaintiff's chair is set on two pairs of legs, each rear leg crossing the corresponding front leg. The upper ends of the legs are pivotally attached to the underside of the seat. In view of the fact that the chair is intended for the use of infants, it has a tray that is usually attached to such chairs. A series of pivotal connections makes the chair easily collapsible, and when folded makes a very short package and thereby reduces the difficulties and cost of shipment, as well as facilitating the handling of the chair by the customer. The particular advance over the prior art, for indeed collapsible high chairs were known previously to the plaintiff's development, consisted, according to the plaintiff, in pivotally attaching the tops of the legs to the under surface of the seat, instead of, as had been a frequent practice theretofore, attaching them to the sides of the seat. This change made it easier to fold the chair and also made a shorter and more compact package when folded.

The patent has five claims, only three of which, claims 1, 2, and 3, are asserted in this litigation. The principal claim is claim 1, and reads as follows:

"A collapsible high-chair comprising: a pair of supporting front legs and a pair of supporting rear legs, the front legs, intermediate their ends, extending across the rear legs intermediate their ends; a pivot member for pivotally connecting said front legs and said rear legs together at the point of crossing, a seat bottom pivotally connected from the underside thereof, forwardly of its transverse medial line, to the upper ends of said rear legs; a seat back pivotally connected, at its lower edge, to the rear edge of said seat bottom and pivotally connected, above its lower edge and below its transverse medial line, to the upper ends of said front legs; a pair, of spaced apart tray supporting-arms pivotally connected to said seat back above the point of connection of said seat back with said front legs and extending forwardly therefrom; and a brace bar pivotally connected, at its lower end, to said seat bottom and to the upper ends of said rear legs and at its upper end to said supporting-arms."

The carrying or inventive element of this combination is asserted to be, "a seat bottom pivotally connected from the underside thereof, forwardly of its transverse medial line, to the upper ends of said rear legs." That is claimed by the plaintiff to be the advance made by Adler.

35 U. S. Code § 112 requires a claim to point out particularly and distinctly the subject matter which the applicant regards as his invention. Strictly speaking, this claim does not do so. It merely enumerates the elements of the com-

bination without indicating wherein it is claimed that the novelty of the invention is to be found. Nevertheless, it has been the practice of applicants for patents for many years to draw combination claims in this manner, and unfortunately many a patent fails, either in its claims or in its specifications, actually to point out wherein the real novelty of the invention is to be found. The Patent Office has acquiesced in this practice and in fact probably a majority of patents containing combination claims are phrased in this manner. It is a fact that one who reads the patent in this instance is unable to determine therefrom in what the novelty of the invention consists. The novelty was, however, pointed out by counsel at the trial, and the plaintiff is submitting the case on the basis of that contention.

There is no doubt that the plaintiff developed an improvement over similar articles that had been previously on the market, and that he contributed a product that has proved commercially useful. Naturally, one has sympathy for a person who develops an ingenious idea, embodies it in a product that he successfully places on the market, and finds that someone else is imitating it and making use of his brain child. The other person, of course, is trying to reap where he did not sow.

The philosophy of the patent law, however, does not contemplate that the 17-year monopoly, such as a patent confers, should be granted to every person who develops a commercially useful idea. There is a sound basis for this view. If every new idea, no matter how minor or how narrow and short a step forward is involved, were subject to a 17-year monopoly, the public would be prevented from making use of ordinary routine improvements, and a person ordinarily skilled in his particular art might be impeded and hindered from making betterments in his work, because someone else might have patented them.

This feature has been emphasized in this Circuit in a recent case, Hycon Man-

ufacturing Co. v. H. Koch & Sons, 219 F.2d 353, 355, in which the court stated:

"In a patent case there are three interested parties, the patent holder, the user of an accused device, and the public. The interest of the last is paramount."

Hence, the patent law has been developed in such a manner as to accord the protection of a 17-year monopoly only to a person who makes an invention, that is, whose idea and development is the product of the inventive faculty that rises to the dignity of an invention, rather than such an improvement or advance as would be within the ability of the average reasonable person familiar with the art in which he works and in which he is reasonably skilled.

A pungent summary of this doctrine in an early case in the Supreme Court is found in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L. Ed. 438. This statement has been often quoted, but stands repetition:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and

apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

A comparatively recent enunciation of the same idea, though differently phrased, is found in the opinion of Mr. Justice Jackson in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. He said:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

Then Mr. Justice Jackson goes on to add the following:

" * * * commercial success without invention will not make patentability."

It is a fact well known to all those who are interested in the law of patents that during the past 25 or 30 years Supreme Court decisions have gradually raised the standard of patentability without actually changing the formula or test of what constitutes a patentable invention. Necessarily, few patents reach the Supreme Court, but of the comparatively small number that have been passed upon by that tribunal, very few have been sustained during the past quarter of a century, and some of those that were sustained were construed so narrowly as to be rendered of but little value.

The 1952 codification of the patent law formulated the tests of patentability as follows. 35 U. S. Code § 103 reads:

"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

The test set forth in the first sentence of Section 103 is phrased substantially no differently than the test that had been evolved by the earlier decisions of the Supreme Court. It is a test that the later decisions have not actually changed in so many words. A question has arisen whether the intention of the Congress in enacting Section 103 was to lower the standard of patentability which had been raised, as has been stated, by the Supreme Court decisions.

The Second Circuit answered this question in the affirmative in a well considered opinion by Judge Learned Hand in Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530. Judge Hand discusses this topic in his usual inimitable manner and reaches the conclusion that in fact it was intended by the Congress to lower the requirement of patentability. It is doubtful, however, whether this Circuit is of the same opinion, because in a later case, Bergman v. Aluminum Lock Shingle Corp., 251 F.2d 801, 802, the Court of Appeals for this Circuit stated:

"Twilight is falling upon 'gadgets' as subjects of patents. The dusk commenced to gather half a dozen years ago when, in an epochal decision, the Supreme Court fixed its canon against dignifying combined 'segments of prior art' with the title of 'inventions'."

The court cites with approval the opinion of the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., to which reference has already been made.

As it is not quite clear whether the doctrine of the Bausch & Lomb case will

be or has been accepted in this Circuit, the court will consider the question from both points of view. As heretofore indicated, there is no doubt that a certain amount of ingenuity and skill was required and was exercised by Adler in developing his chair, and that he made a contribution to the industry, which was to some degree accepted on the market, in that he created an easily collapsible chair that made a very short and compact package. The question necessarily is whether his contribution is the result of mechanical skill or should be deemed to rise to the dignity of a product of the inventive faculty.

In this connection, it must be indicated that the recent section, Section 103, to which reference has been made, did make two changes on the issue of patentability. The second sentence, to the effect, "Patentability shall not be negatived by the manner in which the invention was made" obviously was intended to do away with the requirement that in order to constitute invention the steps taken by the inventor must have been the result of a flash of genius, as some of the cases have said. They may be the consequence of prolonged toil and protracted experimentation in endeavoring to find a solution to a problem. So, too, the invention need not necessarily be made by the proverbial poor inventor experimenting in a garret, but may be the product of a group of scientists or technicians working in a laboratory conducted by a large corporation.

We are dealing in this case with a very narrow art in which a great deal of work had previously been done. Numerous prior patents have been introduced in evidence covering various aspects of collapsible chairs in general, and collapsible high chairs in particular. Collapsible and folding chairs have been known for years, and so have collapsible and folding high chairs. Room for invention in this field naturally is limited, and but short steps in advance are likely to be taken by a person seeking to improve high chairs, unless, indeed, someone should at some time develop an article of an entirely different type.

As has been stated, the steps that the inventor in this case claims constitute the novelty in his product, and on which he predicates the contention that he made an invention worthy of a patent, is the attachment of a pivotal kind between the tops of the legs and the underside of the seat, it having been the previous practice—or at least it is so contended—to attach the tops of the legs to the sides of the seat. It is further claimed that this was not a mere difference in design, but produced a more efficient result in creating a shorter and more compact package when the chair is folded. The difficulty with this contention is that the attachment of the tops of the legs to the underside of the seat was known and disclosed in earlier patents.

The patent to Kidder, No. 1,707,018, issued on March 26, 1929, shows in its drawings, and describes in its specifications, a structure consisting of a folding chair in which the upper ends of the legs are pivotally connected to the seat.

The patent to Dann, No. 70,323, issued on October 29, 1867, on a folding chair, contains a drawing clearly indicating a pivotal connection between the upper ends of the legs and the underside of the seat.

The conclusion necessarily follows that the alleged novel feature of the plaintiff's invention was known and disclosed by the prior art, and consequently the court is of the opinion that the combination as a whole, though it may indeed be an improvement over prior articles of a similar kind, is the product of mechanical skill rather than the result of the exercise of inventive faculty, and therefore under the law does not justify the issuance of a patent.

The court is not unmindful of the fact that the Kidder patent was cited by the Examiner in the Patent Office, although the Dann patent was not. Considerable weight must be attached to the apparent view of the Examiner that the Kidder patent would not bar the issuance of a

patent to Adler. Nevertheless, his opinion in that respect, as well as in other respects, is subject to judicial review. Moreover, since the specifications and the claims in the Adler application did not, as has been indicated, point out specifically what novelty was claimed in the plaintiff's structure, the Examiner obviously had no way of determining what Adler considered to be the invention that he contributed to the prior art. Consequently, the effect of the Examiner's view in this respect must necessarily be weakened.

The court reaches the conclusion that in the light of the foregoing discussion claim 1 of the patent is invalid. Claims 2 and 3 are repetitions of claim 1, with the addition of certain details. Consequently claims 2 and 3 must likewise fall, and all of the three claims are adjudged invalid.

It is the view of the court that while this conclusion might in itself be sufficient to dispose of the first count of the complaint, it is desirable, generally, for a District Court, whenever possible, to dispose of all of the issues of the case, for reasons that are obvious. Consequently, the court will proceed to determine the issue of infringement, that is, whether the defendant must be deemed to have infringed the patent if the patent were held valid.

Infringement is denied, because it is asserted that there are some differences between the plaintiff's structure, that is, the structure of the patent, and the articles actually manufactured and sold by the defendant. Such differences do indeed exist. This is true in almost every case in which infringement is charged. Few imitators make an absolute Chinese copy of an invention, but either consciously or unconsciously introduce modifications or changes, some of which may be major and some minor. In fact, an intentional or unscrupulous infringer would purposely introduce alterations in order to endeavor to meet the charge that the accused structure is an infringement of a patent.

The law is not so impotent as not to reach such situations. Otherwise a charge of infringement could but rarely be sustained, except possibly as to basic or pioneer patents, and most patents would be of but little value. Consequently, in determining whether an accused structure infringes a patent, the rule of reason must prevail and the real test is whether in substance the defendant has used the inventor's idea as embodied in the inventor's structure.

These principles were very forcibly enunciated by Mr. Justice Jackson in Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, at page 607, 70 S.Ct. 854, at page 855, 94 L.Ed. 1097, where the learned Justice made the following statement:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy."

To be sure, a narrow claim covering a combination of many elements in a crowded art must be narrowly construed. Nevertheless, even the narrow construction must be reasonable. The admonition

of old, that "the letter killeth but the spirit giveth life", applies here as it does everywhere else.

The plaintiff's structure has a horizontal rod connecting the points at which each pair of legs crosses. Such a rod is lacking in the defendant's structure. Instead of having this connecting rod, the defendant substitutes a separate rivet connecting each front leg with the corresponding rear leg. There is no connection between the two points of crossing.

The element in the claim involved in this connection reads as follows:

> "a pivot member for pivotally connecting said front legs and said rear legs together at the point of crossing."

It may well be that hindsight might lead to a revision in the phraseology of this clause, but the claim does not require, even on its literal reading, that the points of crossing of each leg should be connected together, because it refers to "the point of crossing." If a connection between the points were necessary to meet this claim, the word "point" in the claim would have to be changed from singular to plural.

The defendant's expert admitted that the rivets in the defendant's structure fulfilled the same pivotal function that is performed by the connecting rod of the plaintiff's invention. Consequently, the court is of the opinion that this element of claim 1 of the patent, covers the rivets used in the defendant's structure to connect each front leg to the corresponding rear leg, and that, therefore, if the patent were valid, it would be infringed by each of the defendant's structures.

· It is claimed, further, that in respect to two of the defendant's structures embodied in defendant's Exhibits 4 and 5, there is no infringement because instead of there being a direct pivotal connection between the brace bar and the upper ends of the rear legs, the brace bar in the defendant's Exhibits 4 and 5 has been moved forward so as not to be directly physically attached to the upper ends of the rear legs.

The element of the claim involved in this connection reads as follows:

> "a brace bar pivotally connected, at its lower end, to said seat bottom and to the upper ends of said rear legs and at its upper end to said supporting arms."

This clause does not require that there be an actual mechanical attachment between the brace bar and the upper ends of the legs. A pivotal connection may be an indirect connection. The mere fact that there may be a space between the two points of attachment is immaterial. As long as there is a chain of connection, and all the intermediate links are present, the claim covers the structure.

Functionally, as is not disputed, the pivotal action is performed in Exhibits 4 and 5 in the same manner, and the operation of the structure is the same in this respect as that of the others of the defendant's structures, and of the plaintiff's structure.

Consequently, the court reaches the conclusion that if the patent were valid, Exhibits 3 and 4 would infringe all three claims, and Exhibit 5 would infringe only claim 1, because it fails to embody the additional elements of the narrower claims.

This brings the court to a consideration of the second count, namely, the count based on unjust enrichment, which seeks compensation for the use of the patented invention during the period that preceded the granting of the patent.

The facts pertaining to this cause of action are as follows. One Haugh, who apparently was a middleman or a broker who in part at least earned his living by trying to market new products and endeavored to interest manufacturers who might fabricate them, learned of the development by Adler of his new folding high chair. He was introduced to Adler by a mutual friend and asked Adler to give him a specimen chair which he would show to persons that he thought

might be interested. Adler did so. Haugh then took the chair to Peterson and indicated in one way or another that he would be interested in endeavoring to negotiate an agreement between Peterson and Adler, or their respective corporations, whereby Peterson would undertake the manufacture of the chair on a royalty basis.

Peterson took the chair and kept it for two months. Admittedly, he examined it carefully, made a photograph of it, showed it to members of his staff who likewise scrutinized it, and then he returned the chair and indicated that he was not interested. Shortly thereafter, through the defendant corporation, he placed a chair on the market that embodied some of the features of the plaintiff's disclosure.

It would seem appropriate at this point to turn to the authorities governing the plaintiff's rights under this state of facts. One of the leading cases on this point is a decision of the Fourth Circuit in which Judge Parker wrote the opinion, Hoeltke v. C. M. Kemp Manufacturing Co., 80 F.2d 912, 922–923. The court stated:

> "The general rule, of course, is that the monopoly of a patent which entitles a patentee to damages for infringement commences only when the patent is granted; but where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another."

And, again, it continues to say:

> "It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the ideas of another without liability for the wrong."

Judge Parker concludes this branch of his discussion as follows:

> "While there was no express agreement that defendant was to hold the information so disclosed as a confidential matter and to make no use of it unless it should purchase the invention, we think that in equity and good conscience such an agreement was implied; and having obtained the disclosure under such circumstances, defendant ought not be heard to say that there was no obligation to respect the confidence thus reposed in it."

The court cites with approval a decision of the Seventh Circuit, Booth v. Stutz Motor Car Co., 56 F.2d 962.

A similar situation was presented in Schreyer v. Casco Products Corp., D.C., 97 F.Supp. 159. There, as in the case at bar, the plaintiff sued both for patent infringement, as well as on the theory of unjust enrichment for use prior to the issuance of the patent. The factual situation was parallel to that confronting the court in the instant case. The District Court made the following statement at page 167:

> "Resolving the factual controversy in favor of the defendants, thereby finding the absence of an express agreement to hold in confidence, the circumstances under which the disclosures were made would, nevertheless, appear to impose upon the defendants an implied obligation not to use the information disclosed unless the negotiations resulted in a license contract. Trade secrets revealed to a prospective purchaser during the course of negotiations cannot be appropriated by the prospective purchaser if the negotiations fail."

The action of the Court of Appeals for the Second Circuit in this case is very significant, Schreyer v. Casco Products Co., 190 F.2d 921. The court reversed the judgment on the cause of action for patent infringement, holding that the patent was invalid. Nevertheless, it af-

firmed the judgment on the cause of action for recovery of damages for use of the invention prior to the issuance of the patent. The court stated at page 924:

"Although the court found no express agreement to hold the information in confidence and not to use it if the negotiations for a license were not successful, there was a confidential relationship created between the parties by the disclosures which restricted the right of Casco to use them to the purposes for which the disclosures were made."

The general doctrine on which these rulings were based was summarized by Judge Charles E. Clark in Matarese v. Moore-McCormack Lines, 2 Cir., 158 F. 2d 631, 634, 170 A.L.R. 440, as follows:

"The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party seeking to charge him. Instead, it applies to situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another. * * * Where this is true the courts impose a duty to refund the money or the use value of the property to the person to whom in good conscience it ought to belong. * * * The doctrine is applicable to a situation where, as here, the product of an inventor's brain is knowingly received and used by another to his own great benefit without compensating the inventor."

The most recent case on this point was decided in this Circuit, in which this doctrine was approved and applied. Filtex Corp. v. Amen Atiyeh, 216 F.2d 443.

■ The principles here involved may be summarized as follows. If a person communicates a novel idea to another with the intention that the latter may use the idea and compensate him for such use, the other party is liable for such use and must pay compensation if actually he appropriates the idea and employs it in connection with his own activities. It is immaterial whether the communication is expressly made in confidence, so long as it is made on an understanding either tacit or express that the person communicating the idea, or the owner of the idea, expected to be compensated if it was to be used by the person receiving it. This doctrine is not limited to patentable inventions, and has been extended to ideas of various kinds that were not subject either to patents or copyrights. An example is found in Belt v. Hamilton National Bank, D.C., 108 F.Supp. 689, affirmed in 93' U.S.App. D.C. 168, 210 F.2d 706.

■ The facts of this case bring the situation that confronts the court in the second count within these principles. The defendant, however, explained that after he received and examined the plaintiff's chair he happened to be in his church one time and saw that the chairs that were used in the church had a similar folding mechanism, or so he thought, as is found in the plaintiff's structure, and consequently he felt free to use that structure because his theory was that it was then in the public domain. It is significant, however, that he had seen these church chairs on numerous prior occasions, but he did not take any particular notice of them and did not derive the thought that it was possible to use a similar mechanism in manufacturing a high chair, until he received and scrutinized the plaintiff's disclosure. It would seem, therefore, to the court that he was using this other structure, which has been denominated throughout the case as the church chair, as an afterthought and as an excuse for using the idea that was communicated to him by the plaintiff through an intermediary.

It may well be that the defendant honestly and in good faith thought that he

was entitled to do what he did. He is not being charged with fraud, actual or constructive. The issue is not one of good or bad faith. Good faith is immaterial. The question is whether the defendant has been unjustly enriched by using the plaintiff's idea, and should pay compensation therefor *ex aequo et bono*.

So, too, the fact that apparently the defendant thought that the plaintiff's device had already been patented does not justify him in doing what he did. The existence or lack of a patent is immaterial because, as indicated, the principles of quasi-contract here applicable extend to both patentable and non-patentable structures and ideas. It is significant that in the Schreyer case, to which reference has been made, the patent was held invalid, but nevertheless the plaintiff was held entitled to recover in quasi-contract for use of the invention for the period prior to the issuance of the patent. The converse likewise follows.

Moreover, the defendant has throughout maintained that the plaintiff's patent is invalid. He has done so successfully, because the court has adjudicated the patent to be invalid. He can hardly take advantage of the patent for one purpose and claim that it is invalid in another connection.

Under the circumstances, the court is of the opinion that the plaintiffs are entitled to recover a reasonable royalty on the chairs manufactured by the defendant and embodying substantially elements of the plaintiff's structure during the period between the date on which Haugh made the disclosure to the defendant of the plaintiff's structure and the date on which the patent was issued.

A transcript of this oral opinion will constitute the findings of fact and conclusions of law.

The court will render a judgment adjudicating the patent involved in this case invalid, and dismissing count 1 of the Complaint on the merits. It will render a judgment, further, adjudicating that the plaintiff is entitled to recover on count 2 of the Complaint as indicated,

and will refer the matter to a Special Master to be appointed to assess the amount of damages.

The plaintiff will recover its costs.