**William R. BLAIR, Jr., Plaintiff,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

**Civ. A. No. 3170–64.**

United States District Court
District of Columbia.

Oct. 24, 1968.

Elliott I. Pollock, Washington, D. C., for plaintiff.

Edward F. McKie, Jr., Harry J. Staas, Washington, D. C., and A. Samuel Oddi, Pittsburg, Pa., for defendant.

## OPINION

HOLTZOFF, District Judge.

This is the trial of an action for patent infringement. The usual issues of validity and infringement are presented. The patent, which is the subject matter of his action, is a patent to Wofford, numbered 2,783,377, and issued on February 26, 1957, on an application filed on November 8, 1951, which in turn was a continuation of an original application filed on August 23, 1951. The patent is entitled "Signal Bias Noise Inverter for Sync Separator Which Cancels Noise Above Sync Pulse Level". The invention is in the field of television receivers. It consists of an electrical circuit intended to eliminate interference that tends to distort or even to destroy the picture on the screen of the television receiver.

Briefly, the picture on the television screen is produced by the motion of an electric beam which moves across the screen from left to right, one line at a

time. When a page or "frame", as it is called, is completed the beam moves to the next page or "frame" and acts in a similar manner. The motion is so rapid that it is imperceptible by the human eye, as is true of a motion picture. This movement is known as "scanning" in the parlance of the industry.

As the beam arrives at the end of each line, it is shifted to the next line by a synchronizing impulse. At the end of a frame, a similar impulse causes a transition to the beginning of the next frame. The synchronizing impulse originates in a separate circuit centering around a vacuum tube. This apparatus is known as a synchronizing separator.

One of the problems of the industry, as already indicated, is to eliminate the presence or interjection of interfering waves that tend to destroy or distort the image on the screen. In the peculiar parlance of the industry such interference is know as "noise". We must not confuse it with what is commonly known as noise, such as static that one hears on a radio receiver. Unfortunately, the jargon of the industry, in part, consists of using ordinary words in a distorted meaning. One is reminded of the famous character in "Through the Looking Glass", who said, "When I use a word it means just what I choose it to mean— neither more nor less. The question is which is to be master? That's all." The result is that the jargon of the industry is somewhat confusing to one not familiar with it.

Various types of apparatus and circuits have been developed for the purpose of eliminating interference or suppressing "noise". One of them is known as a "noise inverter". When interference appears or is about to appear on the screen, the noise inverter comes into operation. It generates another signal that proceeds in the opposite direction and neutralizes and thereby suppresses or eliminates the interference.

The Wofford invention involved in this case is a special circuit in this area. It consists of a connection between the sync separator and the noise inverter, and in using voltage from the sync separator to control or operate the threshold of the noise inverter. The connection illustrated in the patent is a wire, although it is indicated that the invention is not limited to the use of a wire, but also permits the employment of a connection of other types.

The claim involved in this case is claim 3. It is somewhat difficult to discern and analyze. It is 25 lines long and contains some rather obscure phraseology. It requires close scrutiny. It recites numerous elements, as is commonly done with combination claims, some of which are just the known elements of a television receiver. It does not distinguish what Wofford claims to be new and novel in his invention, from other elements of the claim.

It would serve no useful purpose to read the claim in extenso. The carrying element of the claim reads as follows: "Means coupling said voltage to said input of said amplifier circuit to control the threshold level of the response of said amplifier circuit, whereby said amplifier circuit amplifies portions of said noise impulses having amplitudes that exceed the average peak signal level". This clause is contained on lines 22 to 26 of column 6 of the patent. "Said voltage" mentioned in this part of the claim is defined in an earlier clause found in lines 9 to 11, which read as follows: "Impedance means coupled to said sync separator and responsive to the flow of space current therethrough, to generate a voltage the magnitude of which is a function of the average peak magnitude of said input signal". As stated already, the invention consists of the installation or insertion of a connection between the synchronizing separator and the noise inverter, and causing voltage originating at the synchronizing separator to control or operate the threshold of the noise inverter.

This claim is a demonstration of the undesirable manner in which combination claims are commonly drawn. Instead of pointing out the invention, such

a claim enumerates every element of the structure, including those that are old as well as the one that the applicant claims to have invented, without distinguishing or calling attention to the latter. It hides or conceals the invention rather than disclosing it. I have sometimes wondered whether such a claim complies with the requirements of the statute. 35 U.S.Code § 112, paragraph 2, provides that:

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

The English and German type of claim is much preferable because it specifically points out the novel contribution claimed to have been made by the inventor.

As far back as 1917, the Commissioner of Patents approved and encouraged the use of the English or German type of claim. Ex parte Jepson, Decisions of the Commissioner of Patents, 1917. The Commissioner pointed out, at page 65, that:

"The court decisions, however, are full of criticisms of the now prevalent habit of writing claims in the form of a mere catalogue of elements some of which are old and some of which are new, without any grouping or distinction between the old and the new."

Again at page 68, the Commissioner said:

"I agree with the applicant's contention that the old elements should not be catalogued with equal emphasis with the new and that the claim should be so written as to make at once apparent a clear line of demarcation between the old structure and those elements which really constitute the invention."

And again at page 69, he continues:

"The common German and English practice is to state briefly the old general structure in the claim, followed by such an expression as 'characterized by' the certain particular structure which constitutes the patentee's invention."

The Commissioner closes his opinion with the following observations:

"To my mind many of the present difficulties of our patent system, including the difficulty of classification and of avoiding errors in declaring interferences, would virtually disappear if inventors could be induced to confine their descriptions to the essential invention and its necessary setting and their claims to a particular and distinct pointing out of the invention itself as distinguished from the setting."

The Commissioner might well have added that some of the difficulties in interpreting claims, understanding the invention and deciding charges of infringements, are also caused by the manner in which combination claims are drawn. In Blackford v. Commissioner of Patents, 275 F.Supp. 635, this Court had occasion to comment on this matter and wrote with approval concerning the Commissioner's decision. It is to be hoped that the Patent Office will become more insistent on the use of the English type of claim in preference to the obscure and ponderous type that is now commonly employed.

If we were to transform claim 3 of this patent into the English type of claim, I suggest it would read somewhat as follows: "A television circuit containing a sync separator and a noise inverter, *characterized by* the insertion of means connecting the bias voltage generated by the sync separator to the noise inverter in order to control the operating threshold of the noise inverter". Much of the testimony and a good deal of the difficulties of this action might have been eliminated if the claim could have been drawn in some such manner. However, we have to work with what we have.

The first issue to be determined is the issue of validity. It is contended on behalf of the defendant that the patent is invalid in light of the prior art, in that the step taken by the inventor was obvi-

ous to a person reasonably skilled in the art, or to put it in another way, it was the product of mechanical skill rather than of the inventive faculty. It is not claimed or contended that the patent is anticipated.

The present standard of patentability is defined in the 1952 Codification of the Patent Laws, as follows (35 U.S.Code § 103):

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Earlier binding authorities were accustomed to formulate the standard of patentability as requiring that the invention be the product of the inventive faculty and not merely the result of the mechanical skill of a person reasonably skilled in the art.

After the 1952 Codification was enacted, there was considerable discussion as to whether Congress intended, by the new statute, to lower the standard of patentability. There were many who thought that the standard of patentability had been set too high by a series of decisions of the Supreme Court, covering a period of over a quarter of a century. During that period the Supreme Court upheld very few patents. Most of the patents that came before the Court were held invalid. A very illuminating opinion by Judge Learned Hand discusses this question at some length.[1] This doubt was set at rest by the Supreme Court in 1966, in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, in which the Court held that the previous standard of patentability was not changed by the 1952 Codification. Mr. Justice Clark, in his opinion, after exhaustively discussing this subject, summarized the ruling as follows:

"We believe that this legislative history, as well as other sources, shows that the revision was not intended by Congress to change the general level of patentable invention. We conclude that the section was intended merely as a codification of judicial precedents embracing the *Hotchkiss* condition, with Congressional directions that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability."

The claim involved in the instant case is a combination claim. It is probably true that most claims are combination claims because it is only the few pioneer patents that involve a completely new subject matter. The Supreme Court through Mr. Justice Jackson, enunciated the following doctrine concerning combination claims in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

As has already been indicated, in this case the combination claim relates to an electronic circuit. There are electrical circuits without number. To grant a patent on every new circuit would be intolerable. It would stifle progress and shackle industrial development.

1. Lyon v. Bausch & Lomb Optical Co., 2 Cir., 224 F.2d 530, 535–536.

It was stated by the Supreme Court many years ago in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, that:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for *every trifling device, every shadow of a shade of an idea,* which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention." [Emphasis supplied.]

■ It is hardly necessary to observe that electrical circuits may be patented, and in fact many have been patented. A striking illustration is the celebrated "feedback" circuit in the radio art, which is one of the bases of modern radio broadcasting and which has been the subject of much litigation. This Court is of the opinion, however, that if an electric circuit, is to be patentable it must be more than merely new and novel. It must be the product of the inventive faculty and not the result of mechanical skill.

■ This brings us to a consideration of the prior art. An inventor naturally is charged with the knowledge of the prior art.

It is not necessary to analyze separately and in detail every individual patent that is found in the prior art as it existed in 1951. When Wofford made his invention synchronizing separators and noise inverters were well known. This is not disputed. They are shown, among other places, in the patent to Anderson, 2,718,-552, issued on September 20, 1955, on an application filed on May 26, 1951. This patent was cited by the Examiner. It discloses every feature shown in the patent in suit except the connection between the synchronizing separator and the noise inverter. Other devices to eliminate in-

terference were also known in 1951. This is likewise true of the use of voltage originating in one part of the receiver for the control or operation of another part of the receiver.

The patent to Schlesinger, numbered 2,226,994, issued on December 31, 1940, shows the use of voltage originating in the synchronizing separator to control another part of the receiver. This patent was not cited by the Examiner.

In patent numbered 2,299,390, issued on October 20, 1942, Holmes discloses a noise inverter which is operated by voltage derived from another part of the television receiver, in this case the detector circuit. This patent likewise was not cited by the Examiner.

The patent to Richman, numbered 2,933,558, issued on April 19, 1960, on an application filed on July 21, 1950, shows a wire connection from the sync separator for the purpose of transferring voltage from the synchronizing separator to the apparatus used by Richman to eliminate interference, except that in his case the apparatus to eliminate interference is not a noise inverter but a different device which he calls a noise suppressor. This patent likewise was not cited by the Examiner.

Thus, we find that it was well known to use voltage developed in one part of the receiver to operate another part, and to transfer such energy by means of a wire connection. Specifically, it was well known to make use of the voltage developed or generated by the synchronizing separator to operate some other part of the receiver and even to operate a device used for the suppression or elimination of interference. In view of this knowledge, connecting the synchronizing separator with the noise inverter, especially when we consider that Richman had done the same thing with his noise suppressor, was obvious and the product of mechanical skill rather than of the inventive faculty.

The history of the Wofford invention is of interest and possibly of some significance. Wofford is an engineer employed by the Bendix Corporation, which in 1951, when the invention was made,

was manufacturing television receivers, among many other types of apparatus. Wofford reported his contribution to his superiors on a blank form supplied for that purpose, as a matter of routine. Bendix applied for a patent and in due time obtained it, perhaps as a matter of precaution. Actually, Bendix never used Wofford's invention, but employed circuits of other types to accomplish the same result. Finally, Bendix transferred the patent to the present plaintiff, retaining, however, an interest in the litigation. One might well wonder whether Mr. Wofford's employers had as high an opinion of the invention as, naturally, he would have had himself.

■ The Court, therefore, finds and concludes, that claim 3 of the patent in suit is invalid, as obvious within the meaning of 35 U.S.Code § 103, and as a product of mechanical skill and not of the inventive faculty.

■■ Even though the Court holds the patent invalid, the Court will also determine the issue of infringement. It is efficient judicial administration for a trial court to decide all issues of a case. This Court has done so in respect to the issue of infringement in other cases, even after holding a patent invalid. Trenton Industries v. A. E. Peterson Manufacturing Co., 165 F.Supp. 523, 529; Filmon Process Corp. v. Spellright Corp., 274 F.Supp. 312, 316.

■■ In order to infringe, the accused structure need not be an exact reproduction or a copy of the patented device. If there were such a requirement, there would be few if any infringements. No two minds think exactly alike. No two human beings work in the same manner. Moreover, if such were the rule, an intentional infringer would find it easy to escape the charge of infringement by purposely and designedly introducing some change in the patented structure. If an accused structure substantially includes all elements of the patented structure or its equivalents, if it operates in substantially the same manner and if it accomplishes the same result, the charge of infringement should be sustained.

The law on infringement was very pointedly summarized by Mr. Justice Jackson in Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097, where he said:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing."

And then again he says:

"Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system."

■ In the case at bar, the infringement by the defendant, consists of using a mechanism which contains a wire connection between the synchronizing separator and the noise inverter. This is the crux of the Wofford invention. The fact that Westinghouse inserts a resistor in the wire connection does not affect the situation. That an infringing structure contains an additional element not found in the patented structure is immaterial. In Marston v. J. C. Penney Co., 353 F.2d 976, 985, it was held by the Fourth Circuit that:

"One cannot avoid infringement by an addition to a patent even though the addition is important to the use intended for the resulting article."

This Court had occasion to apply this rule in Filmon Process Corp. v. Spellright Corp., supra.

In Trenton Industries v. A. E. Peterson Manufacturing Co., 165 F.Supp. 523 at 529, I had occasion to make the following observations on the contention that the charge of infringement may not be sustained if there are some differences between the structure of the patent and the infringing articles:

"Such differences do indeed exist. This is true in almost every case in which infringement is charged. Few imitators make an absolute Chinese copy of an invention, but either consciously or unconsciously introduce modifications or changes, some of which may be major and some minor. In fact an intentional or unscrupulous infringer would purposely introduce alterations in order to endeavor to meet the charge that the accused structure is an infringement of a patent.

"The law is not so impotent as not to reach such situations. Otherwise a charge of infringement could but rarely be sustained, except possibly as to basic or pioneer patents, and most patents would be of but little value. Consequently, in determining whether an accused structure infringes a patent, the rule of reason must prevail and the real test is whether in substance the defendant has used the inventor's idea as embodied in the inventor's structure."

As has been already stated in the case at bar, the defendant's circuit contains a wire connection between the synchronizing separator and the noise inverter, which is the crux of the Wofford structure. Both reach the same result, namely, the control or operation of the threshold of the noise inverter by the voltage passing from the synchronizing separator to the noise inverter. The differences in the manner of operation are not so substantial as to save the defendant's structure from the charge of infringement.

In this connection the Court does wish to say and emphasize, that there is no evidence whatever that the infringement was intentional. The defendant's engineer, who devised the circuit used by Westinghouse, which apparently Westinghouse did not consider of sufficient importance to justify an application for a patent, testified that he had never heard of the Wofford patent until he was called upon to prepare to testify in this litigation. He impressed this court as a gentleman of probity, and the Court believes him. It is, of course, elementary, that an infringement may be entirely inadvertent and unintentional and without knowledge of the patent. In this respect the law of patents is entirely different from the law of copyright.

The Court, therefore, finds and reaches the conclusion that if the patent were valid, claim 3 of the patent would be deemed infringed by the defendant in respect to the structure concerning which testimony has been given at this trial.

In conclusion, judgment will be rendered dismissing the complaint on the merits.

This opinion will constitute the findings of fact and conclusions of law. Proposed supplemental findings may be submitted by counsel if desired. Counsel will submit a proposed judgment.