**MATARESE v. MOORE–McCORMACK
LINES, Inc., et al.**

No. 74, Docket No. 20340.

Circuit Court of Appeals, Second Circuit.
Dec. 10, 1946.

Joseph K. Inness, of New York City, for appellants.

Alvin Cushing Cass, of New York City (Tyson & Tyson and T. Kenneth Tyson and Sidney Worthman, all of New York City, on the brief), for appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal raises the issue whether a corporation may be required to pay the reasonable value of the use of certain inventive ideas disclosed by an employee to an agent of the corporation in the expectation of payment where an express contract fails for want of proof of the agent's authority. Here the plaintiff, being refused compensation, brought suit upon an alleged express contract to pay one-third of the savings realized by the defendants through the use of his devices. The suit having been instituted in the Supreme Court of New York, defendants removed it to the federal court because of their diverse citizenship from that of plaintiff, a New York citizen. During the trial plaintiff abandoned his theory and, over the objections of defendants, amended his complaint by adding a prayer for recovery of quantum meruit upon the theory of unjust enrichment. The court submitted the case to the jury upon this theory, and it returned a verdict for plaintiff for $90,000. This, upon motion, the district judge ordered set aside unless the plaintiff consented to its reduction to the sum of $40,000. The plaintiff so consented, judgment was entered for the latter sum, and defendants appeal.

The plaintiff is a man of little education, who, emigrating to this country from Italy some forty-six years ago, had always worked around the docks and in 1938 was employed as a part-time stevedore on defendants' pier. His case, which the jury quite obviously must have accepted in full, was that in August of that year he informed Furey, defendants' agent in charge of the pier, that he had something which would facilitate cargo loading and unloading, thus saving the defendants much money and preventing the numerous accidents ordinarily occurring at the pier.[1] So, at

---

[1] The record below did not separate the roles played by the two corporate defendants, of whom the second appears to have been a stevedoring subsidiary of the first; and since no question is made as to this on appeal, we shall treat them as a unit. Furey was originally joined as a defendant, but was dismissed as a party before issue joined without objection by the plaintiff.

plaintiff's invitation, Furey made a special trip to plaintiff's home in the Coney Island section of Brooklyn and was there shown models of devices for loading and unloading cargo which the plaintiff had invented. Present were not only plaintiff and Furey, but also plaintiff's son and a friend named Devereaux, all of whom handled the models in an operational demonstration. All of these were witnesses at the trial; and even Furey, testifying for the defendants, admitted the visit to plaintiff's home and the demonstration of the models, while denying any further commitments upon his part. According to plaintiff and his witnesses, however, Furey expressed his satisfaction with the models and promised the plaintiff one-third of what the defendants would save by use of the device. He suggested that plaintiff patent his device and offered to be the plaintiff's partner in exploiting it. He also offered the plaintiff the job of supervising the construction of his devices for defendants on the defendants' premises and with the defendants' materials. Plaintiff accepted the job and continued to receive longshoreman's pay until the end of the year, when, presumably, he received gearman's pay. After a full-scale test of plaintiff's devices, defendants put a great number of them into use at the pier under Furey's charge and at other piers subsequently acquired by them. From time to time plaintiff asked Furey about his money, and Furey always assured him that he would be compensated in the future. In 1941, however, Furey sent plaintiff to another agent of the defendants, who discharged him from his job. This action was commenced in April, 1943.

■ Meanwhile on January 28, 1939, plaintiff applied for a patent. The application was divided in the patent office in 1940, and on March 18, 1941, plaintiff was issued two patents. One was for a "cargo loading and unloading apparatus," consisting of a reversible 5' x 4' wooden pallet, and a flexible bridle, a guiding frame, a mesh net, and lifting bars to transport the pallet between ship and pier. The other was for a "cargo loading and unloading platform," or stationary wooden platform attached to, and extending out from, the pier. Defendants objected to the admission of these patents in evidence, asserting that they were "secretly after-acquired" grants which were invalid for want of invention and that their admission was highly prejudicial on plaintiff's claim of novel invention. But the question of validity of the patents was not involved, and the court very carefully explained to the jury that it was not. The patents, however, were properly admitted, as part of the history of events between the parties, taken pursuant to Furey's direction and plan of retaining the benefit to defendants alone.

■ The main legal issue of the appeal turns, therefore, upon the validity of plaintiff's claim of unjust enrichment under the circumstances of this case. Defendants object to the amendment of the complaint from the theory of the contract, but an amendment of even more extensive character would have been permissible under Federal Rules of Civil Procedure, rule 15(b), 28 U.S.C.A. following section 723c, had it been necessary to have presented the real issue actually litigated between the parties. In fact, however, this appears to have been merely an amendment to change the prayer for relief and was quite unnecessary, since the demand for judgment does not limit the form or amount of the relief except in case of a judgment by default. Federal Rules of Civil Procedure, rule 54(c); Gins v. Mauser Plumbing Supply Co., 2 Cir., 148 F.2d 974, 976. But of course defendants were not harmed, but were rather helped, by the extensive warning thus given at an early stage of trial of plaintiff's complete legal theory. Defendants also claim that, since Furey was not shown to have been authorized in the premises, none of the negotiations were admissible in evidence. They claim that the admission of the negotiations necessitated "repeated and continuous objections" by them which, when overruled, "seriously prejudiced the defendants in the eyes of the jury." But the showing of grounds for a reasonable expectation of compensation was a necessary part of the plaintiff's case, as he conceived it, and the number and amount of objections need-

ed by defendants to present their own theory was a matter of their own free choice. These subordinate issues therefore simply lead back to the main question of the legal validity of the case submitted by the court to the determination of the jury.

■ The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party seeking to charge him. Instead, it applies to situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another. Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337; Byxbie v. Wood, 24 N.Y. 607, 610; White v. Continental Nat. Bank, 64 N.Y. 316, 21 Am.Rep. 612; Oneida County v. First Citizens Bank & Trust Co. of Utica, 264 App.Div. 212, 35 N.Y.S.2d 782; 1 Williston on Contracts, Rev.Ed.1936, § 3, p. 9. Where this is true the courts impose a duty to refund the money or the use value of the property to the person to whom in good conscience it ought to belong. Restatement, Restitution, 1937, § 1(a); Pullman's Palace-Car Co. v. Central Transp. Co., 171 U.S. 138, 152, 18 S.Ct. 808, 43 L.Ed. 108. The doctrine is applicable to a situation where, as here, the product of an inventor's brain is knowingly received and used by another to his own great benefit without compensating the inventor. This is recognized in the leading New York case of Bristol v. Equitable Life Assur. Soc. of New York, 132 N.Y. 264, 267, 30 N.E. 506, 507, 28 Am.St.Rep. 568. In that case the New York Court of Appeals dismissed a complaint based on the use by defendant of an advertising scheme of which plaintiff had apprised it, because the scheme was not original and because it was not alleged to be marketable. The court, however, was careful to distinguish the situation in which an invention is involved, saying: "In such cases [of inventions] there is a production which can by multiplying copies be put to

marketable use, * * *. Whoever infringes takes benefits or profits which otherwise would naturally come to the producer." Later New York cases have not weakened the force of this exception. In Rodriguez v. Western Union Tel. Co., 259 App.Div. 224, 18 N.Y.S.2d 759, affirmed 285 N.Y. 667, 34 N.E.2d 375, the plaintiff's scheme was not in fact adopted by the defendant. In Williamson v. New York Cent. R. Co., 258 App.Div. 226, 16 N.Y.S.2d 217, it was held that the plaintiff's idea for the staging of a miniature railroad at the New York World's Fair was too abstract to be made the basis of a property right and that therefore no inquiry into the novelty of the idea was required.

■ Courts have justly been assiduous in defeating attempts to delve into the pockets of business firms through spurious claims for compensation for the use of ideas. Thus to be rejected are attempts made by telephoning or writing vague general ideas to business corporations and then seizing upon some later general similarity between their products and the notions propounded as a basis for damages. See Grombach Productions v. Waring, 293 N. Y. 609, 59 N.E.2d 425; Lueddecke v. Chevrolet Motors Co., 8 Cir., 70 F.2d 345. Such schemes are quite different from the situation envisaged in the Bristol case, supra, and that at bar. Here the relationship between the parties before and after the disclosure, the seeking of disclosure by Furey, Furey's promise of compensation, the specific character, novelty, and patentability of plaintiff's invention, the subsequent use made of it by defendants, and the lack of compensation given the plaintiff— all indicate that the application of the principle of unjust enrichment is required. Miller v. Schloss, supra.

Defendants, relying upon the concession of lack of proof of Furey's authority to make the contract as originally alleged, claim a like lack of authority to accept the benefit of plaintiff's ideas to such an extent as to make them liable to pay reasonable compensation therefor. Such liability, they assert, could be based only on

an extensive and fearsome corporate responsibility to pay for all chance ideas of an employee unwittingly utilized by the corporation. We may pass the interesting question how far an unwitting appropriation of property in ideas may create liability, since the case was presented and submitted to the jury on the theory of valuable services rendered by the plaintiff either to the knowledge of the defendants or "at the instance of someone authorized to obtain such services for the defendant." The court in its first reference to this issue stated it thus alternatively. Then at the close of its charge, it granted the defendants' request for a charge, indeed repeating it twice in colloquy with counsel, that the defendants "must have knowingly used it, knowing that it was plaintiff's device."

This charge, it seems to us, was justified upon the record. There was evidence that plaintiff was authorized by Furey to manufacture his devices using defendants' workmen and materials; that his devices were demonstrated on the pier in the presence of Furey "and all the rest of the officials, foreman and all"; that he was directed to go ahead with the manufacture of the pallets, something with which previously he had nothing to do; that he then went to work full time for defendants; and that Furey was promoted in the fall of 1938 from Stevedore Superintendent to Chief of Operations, an executive position with wide powers and an increase of pay. Furey's denial that these changes and advances were due to the utilization of plaintiff's ideas was of course offset not merely by plaintiff's testimony, but by such matters as Furey's specific written direction to plaintiff on December 20, 1938, for the making up of twenty-four pallets, together with numerous wire nets, frames, and bridles, for delivery by Saturday morning, December 30. Moreover, Commodore Lee, defendants' executive vice-president, visited the docks regularly at least once a -week, knew the plaintiff and spoke to him at work, and saw the extensive use of his devices at this period. It would seem that an inference of actual knowledge by Lee would be justifiable under the circumstances; but in any event Furey's position by that time in the corporate structure was surely sufficiently high to justify his accepting for the company the benefits of more efficient stevedoring. It is true that defendants presented some evidence of use by them of pallets and loading platforms similar to plaintiff's on other operations in Philadelphia and perhaps in New York as early as 1937; but the evaluation of this evidence was of course for the jury, who may indeed have been unfavorably impressed by the somewhat halting and vague nature of the testimony from a responsible company official as to a matter which would seem capable of definite and exact proof.

With the issue of unjust enrichment settled in favor of plaintiff, the final major issue was as to the rate of compensation. The judge properly charged that recovery must be based upon the "reasonable value of the use" of the devices and the "reasonable value of the services" rendered by the plaintiff. Pullman's Palace-Car Co. v. Central Transp. Co., supra; Restatement, Restitution, 1937, § 1(a). Defendants contend that there was not sufficient proof of damages, either in fact or in amount, to justify submission of the case to the jury.

Plaintiff's evidence was, however, adequate to show extensive gross savings earned for the defendants by his devices. Thus the loading platforms attached to the piers saved the defendants expense of additional labor, since they remained stationary and level with the pier, despite the movements of the tide. Platforms previously used tilted when the tide changed and therefore had to be raised or lowered with each change. Approximately five minutes was consumed in this operation, and during that time the twenty-one men normally comprising a loading gang were idle. The witness Devereaux estimated that forty or forty-five minutes per eight-hour shift would be lost in this manner. Approximately eight gangs were used on a pier at once, and the average wages for longshoremen in 1941, as given in the evidence, was $1.20 per hour. By the elimination of the raising and lowering operations alone, therefore, it could be found that

about $50,000 was saved to the defendants on one year's operation of one eight-hour shift on one pier. This figure does not include the money saved in insurance premiums because of the lowering of the accident rate brought about by the use of the plaintiff's platforms.

So, too, plaintiff's loading and unloading apparatus saved the defendants money in a number of ways. As we have seen, an important feature of this apparatus was the wooden pallets. These were equipped with retaining bars to keep the cargo from falling off and were double floored, with a space between the floors. Transverse braces between the floors maintained this space and divided it vertically into two parts. When the pallet was removed from the lifting device, the two prongs of an elevator truck—called a "hi-lo truck"—could be inserted into this space and the pallet, still bearing its cargo, carried about the pier by the truck and mechanically tiered to any desired height within the reach of the truck's elevating arm. When previous devices were in use, cargo was often crushed during the loading and unloading operations, and longshoremen were often injured by cargo falling from the apparatus. Plaintiff's apparatus practically eliminated both types of accident and therefore necessarily reduced defendants' insurance premiums.

But further, there was a direct saving in the operations required. Before the adoption of plaintiff's apparatus, cargo being unloaded was placed on loading trays in the ship's hold, carried to the pier, unloaded off the trays, sorted into storage classifications, and then carried to storage locations on the pier. Because of the mobility of plaintiff's pallets, a new operation was instituted when they were put into use. Sorting of cargo was done in the ship's hold; and, when the pallets were set down on the pier, they were picked up by hi-lo trucks and carried with the cargo still on them to storage locations on the pier. When consignees called for shipments, the pallets were trucked off the pier and were then unloaded not by employees of the defendants, but by agents of the consignee. A complete unloading operation was there-fore eliminated by the use of plaintiff's pallets. There were savings also in storage operations. Previously, tiering of cargo in the pier storage space was done by hand. When plaintiff's pallets were used, this labor was saved, since the hi-lo elevator did the tiering mechanically. Moreover, since the cargo could be tiered twice as high, twice as much cargo could be stored on the pier and a more efficient use of rented pier space was thereby effected. Savings in material costs were achieved. Because of the design of the plaintiff's apparatus, the rope used in it required replacement less often than the rope in devices previously used. Moreover, in the unloading and loading operation itself, four fewer men per gang were required when the plaintiff's apparatus was in use. Loading and unloading of ships was going on at one of the defendants' piers (the only one about which operational time statistics were introduced) about twenty hours a day, and 50 to 60 per cent of the cargo was loaded and unloaded in plaintiff's pallets. Thus the amount of money saved per pier a year by the use of plaintiff's pallets in the actual loading and unloading operations only could be found to be about $140,000. The defendants in 1941 operated ten piers, and the plaintiff's devices were used on all of them. Moreover, the period of time for which damages were recovered extends to the date on which the verdict was given, in December, 1945. Restatement, Restitution, 1937, § 157(c). The total gross savings from the use of both platforms and unloading apparatus on all piers were obviously much higher than the yearly per pier figures.

Since the amounts thus indicated are much higher than the award as finally made, the only question arises because plaintiff did not offer evidence on the cost to the defendants of producing the plaintiff's devices. Records containing this information were of course in the possession of the defendants. Plaintiff did, however, prove the fact of damages; and the amount of damages could be determined as a matter of just and reasonable inference from the plaintiff's evidence. When that evidence was introduced, the plaintiff had

established his right to a judgment for the approximate amount of his damage unless the defendants, having possession of the cost records, introduced evidence to fix more precisely the amount of the damages. Anderson v. Mt. Clemens Pottery Co., 66 S.Ct. 1187, 1192. The rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain. Anderson v. Mt. Clemens Pottery Co., supra; Bigelow v. RKO Radio Pictures, 66 S.Ct. 574. Where the fact of damages is certain, the uncertainty of the amount will not prevent their being assessed. Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 4 N.E. 264, 54 Am.Rep. 676; Bogardus v. U. S. Fidelity & Guaranty Co., 269 App.Div. 615, 58 N.Y.S. 2d 217; Smalling v. Jackson, 133 App.Div. 382, 117 N.Y.S. 268; Mortimer v. Bristol, 190 App.Div. 452, 180 N.Y.S. 55; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 377-379, 47 S.Ct. 400, 71 L.Ed. 684; Bigelow v. RKO Radio Pictures, supra. The profitability of using plaintiff's devices was shown by the defendants' immediate and complete adoption of them. The cost of production might have bulked large if the profits earned within the first year of their use were the only profits being considered. There is no reason to suppose, however, that after the first cost of replacing previous devices with those of the plaintiff had been met, the cost of maintaining and replacing the plaintiff's devices was significantly greater than the cost of maintaining and replacing the devices previously used. Indeed, the cost of replacing rope was substantially diminished. In the light of these considerations the failure of defendants to introduce their cost records as part of their case tends to indicate that the cost of production might not be very high relative to the savings effected through the use of plaintiff's devices. Under the relevant principles of law here stated and the evidence introduced at the trial, the damages ultimately awarded were not excessive.

Affirmed.