**Maurice A. KRISEL, Plaintiff,**

v.

**Rafael DURAN, Sam J. Van Hining, Economic Development Administration of Puerto Rico and Phillips Petroleum Company, Defendants.**

No. 65 Civ. 2702.

United States District Court
S. D. New York.
July 28, 1969.

Cardozo & Cardozo, New York City, for plaintiff; Roman Beck, Benjamin M. Cardozo, Maurice A. Krisel, Edwin D. Kyle, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant Phillips Petroleum Co.; Robert MacCrate, Thomas E. Patton, New York City, of counsel.

EDWARD WEINFELD, District Judge.

The basic facts upon which plaintiff seeks to hold the defendant Phillips Pe-

troleum Company [Phillips] liable are set forth in this Court's earlier opinion dismissing the action against the Economic Development Administration of Puerto Rico [EDA] on the jurisdictional ground that EDA was an instrumentality of the Commonwealth of Puerto Rico and that since the Commonwealth was the real party in interest, diversity jurisdiction was lacking.[1]

Familiarity is assumed with the prior opinion, which noted that although plaintiff had no dealings with Phillips, his claims against it "are hinged to those asserted against EDA." The Court held that insofar as plaintiff sought recovery against EDA upon an express contract of nondisclosure or confidentiality of his program for the development of a petrochemical complex, he had failed by affidavit and deposition to show the existence of any triable issue. Plaintiff, however, contended that this could be established through his two friends, Jose Feliciano and Abraham Nieves, who had acted on his behalf in discussions with EDA officials in Puerto Rico. Feliciano and Nieves had already, by affidavit, negated plaintiff's various claims against EDA. Since plaintiff persisted that their denials were the result of pressures upon them, the Court afforded him the opportunity to take their depositions, and accordingly denied Phillips' motion for summary judgment without prejudice to renewal upon completion of their testimony. Their depositions, which have been completed, repel rather than support plaintiff's claim of an express contract. Indeed, plaintiff now disavows any reliance upon an express contract of nondisclosure or confidentiality. In any event, there is no factual support for the claim of an express agreement of nondisclosure.

Plaintiff contends, however, that triable issues of fact exist upon either one of two claims: (a) a contract implied in fact, or (b) a contract implied in law, or a quasi contract. With respect to these claims he also urges it is not necessary

1. Krisel v. Duran, 258 F.Supp. 845 (S.D.N.Y.1966), aff'd, 386 F.2d 179 (2d Cir. 1967), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968).

to establish the proposed program was original, novel and specific, although he does make that contention. Upon this record plaintiff's claims, however viewed, cannot be sustained. The prolix and argumentative affidavits submitted by plaintiff and the extensive and at times discursive briefs cannot create issues of fact which do not exist, nor do they convert this suit into a complex litigation so as to foreclose the grant of summary judgment where it is indicated.[2]

### A. The claim of an implied in fact agreement.[3]

Here plaintiff contends that the totality of circumstances under which his proposal was submitted to EDA permits an inference of an implied in fact agreement of nondisclosure with an implicit understanding that if the ideas embodied therein were used or disclosed he would be compensated.

Plaintiff's interest in the development of a petrochemical complex in Puerto Rico was kindled by his representation of a client in the United States who was in need of a source of fuel oil. It appeared that such a supply could be derived as a by-product or surplus of petroleum feed stock required for an oil refinery and petrochemical complex. Up to this time, about May 1961, plaintiff, without experience in operating refineries, was unaware of the governmental restrictions of oil importation into Puerto Rico.[4] In the furtherance of his client's interest he made preliminary inquiry of EDA representatives in New York and Puerto Rico and soon learned that indispensable to any project was an increase in the oil import quota for Puerto Rico. Plaintiff thereafter submitted a proposal, or, as he terms it, a program to EDA in a letter of September 25, 1961, through Nieves to Durand, whom plaintiff had never met. In pertinent part it states:

"* * * [W]e are conveying to you hereby our program for the development of an industrial complex in Puerto Rico predicated on your Government issuing to our enterprise a commitment that:

"1. The Commonwealth government will obtain a quota of foreign crude oil, preferably Venezuelan, for our use sufficient in barrelage per day to warrant our going ahead with our plans. * * *

* * * * * *

"The project depends entirely on your obtaining the quota of oil required."

On October 16 Durand rejected the proposal, stating that the "Commonwealth of Puerto Rico will not entertain a commitment to satisfy the first condition stated in your letter of September 25 * * *." The circumstances under which Phillips, two and a half years later, in 1964, applied to the Department of the Interior, with Commonwealth and EDA support, for a quota of 50,000 barrels per day for use in its projected petrochemical complex are set forth in the prior opinion.

Plaintiff, from the inception of this suit, has contended that the plan outlined in the letter of September 25, and allegedly submitted in confidence to EDA, was a novel and original program for the development of a petrochemical plant in Puerto Rico and for obtaining therefor a

---

2. *Cf.* First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed. 2d 569 (1968).

3. "To establish a contract implied in fact plaintiff would have to show that the parties in their dealings with each other in regard to the subject matter understood that if the defendants used the plaintiff's idea and material it would pay what it was reasonably worth; that upon that understanding defendants did so use the material; and that this arrangement was arrived at not by express words but by such conduct, looked at in the context of the trade and their familiarity with it, that makes it clear that such was the understanding they reached." Robbins v. Frank Cooper Assocs., 19 A.D. 2d 242, 241 N.Y.S.2d 259, 261 (1st Dep't 1963), rev'd on other grounds, 14 N.Y.2d 913, 252 N.Y.S.2d 318, 200 N.E.2d 860 (1964).

4. Krisel v. Duran, 258 F.Supp. 845, 856 (S.D.N.Y.1966), aff'd, 386 F.2d 179 (2d Cir. 1967), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968).

substantial increased oil import quota, and so we consider this contention first. Plaintiff has summarized his program as containing five important elements.[5] Four of these admittedly were known to and were within the experience of EDA long prior to plaintiff's submission, to wit, the concepts of (1) a petrochemical complex with its economic and employment aspects for the benefit of Puerto Rico; (2) the importation of oil feed stock to sustain such a complex, principally from Venezuela because of its proximity and cheap price; (3) tax exemption by the Commonwealth of Puerto Rico to encourage private enterprise; and (4) investment participation in projects by the Puerto Rican public.

■ Plaintiff's claim of originality centers about the fifth element, to wit, the use of the political power and prestige of the Commonwealth and its officials in support of the application for an increased quota of the daily barrelage necessary for the contemplated project. He described this element as "most important of all, a means of importing the necessary oil—a means of opening the quota door—by the use of the political prestige, power, and leverage of Puerto Rico and its economic needs." And in his deposition he characterized the condition in his letter of September 25 that the Commonwealth commit itself to obtaining a foreign quota of crude oil "as the foundation stone of the entire program," and added, "my whole object was to utilize the position of the Puerto Rican governor, Munoz-Marin, and the Puerto Rican government's economic program * * * its prestige * * *," to secure favorable action by federal officials. This element of plaintiff's program was neither original, unique nor concrete, whether considered singly or in combination with the four elements referred to above. The concept was usual and commonplace. Any amendment of Puerto Rico's existing quota allocation to obtain the crude

oil essential for petrochemical processes was subject to determination by the United States Secretary of the Interior on appropriate application under regulations promulgated pursuant to Presidential proclamation.[6] Thus, an indispensable requirement of any petrochemical complex, whether proposed by plaintiff or by any other person, was an import license reflecting the quota increase. Without it there could be no project. What plaintiff sought was Commonwealth support for the increased oil quota essential for the proposed project. That plaintiff sought such support for a larger quota than the Commonwealth or EDA officials considered feasible or attainable, whatever their reasons, did not make his request for governmental assistance original or unique, nor did it constitute a valuable idea. His idea was no more than the enlistment of the prestige and power of the Commonwealth and its officials in aid of an entrepreneurial undertaking that purportedly would also advance the Commonwealth's economic and industrial program—the kind of governmental support that is sought day in and day out for projects that allegedly serve the community interest. One need but pick up the daily press to read that the governor of a state, the mayor of a city, or the head of a public authority has made representations to other public agencies, whether executive, legislative or administrative, in furtherance of a local project, whether publicly or privately financed or sponsored. To hold that a request for the use of the political power and the prestige of a state or its officials in support of a governmental license, without which a project cannot get off the ground, constitutes an original or valuable idea flies in the face of common experience. To hold that the rejection of plaintiff's proposal for such support by the Commonwealth and the latter's favorable support of another's

---

5. 258 F.Supp. at 859.

6. See Presidential Proc. No. 3279, 24 Fed. Reg. 1781 (1959); see also Atlantic Ref.

Co. v. Standard Oil Co., 113 U.S.App.D.C. 20, 304 F.2d 387 (1962).

application give rise to a cause of action for appropriation of a valuable idea would put governmental bodies and public agencies at the mercy of rejected supplicants. Governments and their agencies, no less than business firms, are entitled to be protected against such spurious claims for compensation for the use of ideas.[7]

Plaintiff alternatively contends that even though the idea of the use of political power and prestige in support of an increased quota application may not be original, the proposal was submitted under such circumstances that an implied in fact agreement of nondisclosure was contemplated and that if used plaintiff would be compensated. Passing the very substantial question whether, under New York law, in the absence of an express agreement of nondisclosure and compensation, recovery can be had upon an implied in fact agreement for an idea which lacks originality or specificity,[8] nothing in the dealings of the parties warrants the inference that plaintiff and the EDA representatives understood that if EDA later gave its support to another for an import oil quota plaintiff would be compensated or that plaintiff submitted his proposal upon any such understanding.

As already noted, plaintiff's initial interest in a petrochemical complex did not derive from any contact or relationship with EDA. It was on behalf of a client who needed a source of fuel oil that could be obtained as a by-product of the petroleum feed stock required for an oil refinery and petrochemical complex. Plaintiff, in his effort to achieve that purpose, made inquiry of EDA representatives, but received no encouragement. The type of proposal submitted by plaintiff for the development of a petrochemical complex was not unknown to EDA and to the petroleum industry. Since the 1950's petroleum refineries and related petrochemical products and processes had been a critical part of the Puerto Rican development program. EDA had, prior to plaintiff's submission, made representations to the Department of the Interior in support of the applications of others for increased oil import quotas. The short of it is, however phrased, plaintiff was seeking the same type of support for the project in which he was a joint venturer with his client. He was not seeking compensation for an idea. Nothing in the correspondence, in the deposition testimony, or in the dealings of the parties gives the slightest support to the claim or permits an inference that if the Commonwealth did give its political endorsement for an increased quota to another—in this instance, Phillips—that plaintiff would be compensated. To uphold his position would mean that the Commonwealth was effectively barred from supporting a third party's application for an increased oil quota required in the development of petrochemical complexes unless the Commonwealth compensated prior applicants who had sought but been refused such assistance.

Plaintiff, however, urges that the Commonwealth and EDA were not necessarily cast in this position. He argues that he was entitled to receive what he terms a "headstart" against other applicants—that his proposal should not have been rejected without having been afforded a reasonable opportunity to meet whatever reasonable conditions EDA might impose, including availability of adequate financing and ability to perform. But acceptance or rejection of plaintiff's proposal was a matter of EDA's judgment. How to conduct business; with whom to do business; whether to support applications for increased oil quotas, and if so, to what extent; whether to prefer one applicant as against another, were decisions that rested within its sole discretion. The fact, if it be the fact, that

7. *Cf.* Matarese v. Moore-McCormack Lines, 158 F.2d 631, 634, 170 A.L.R. 440 (2d Cir. 1946).

8. See Grombach Prods. v. Waring, 293 N.Y. 609, 59 N.E.2d 425 (1944) and other cases cited in the Court's prior opinion, 258 F.Supp. at 858 n.53.

plaintiff's proposal was submitted prior to that of Phillips or any other applicant did not give him priority of consideration. EDA's right to refuse to do business with plaintiff or to reject his proposal was not forfeited thereby.

### B. The implied in law or quasi contract claim.[9]

Plaintiff's further contention is that the totality of circumstances established a relationship of trust and confidence flowing from an invitation to submit his program for consideration by EDA and its policy of treating proposals from entrepreneurs in confidence, and accordingly the law imposed, if the ideas embodied in his proposal were used by EDA, an obligation to compensate him for the claimed breach of confidence.

■ The fact situation of the instant case is so far removed from those contained in the cases upon which plaintiff relies to sustain this claim that analysis of the differences is not required.[10] Central in all these cases is undue advantage through unfair conduct —a breach of confidence and reprehensible means of obtaining the valuable property rights of another without compensation.[11] They rest upon the equitable doctrine that one shall not be allowed to enrich himself unjustly at the expense of another.[12] The mere statement of the concept indicates the lack of any factual content to support plaintiff's claim. Plaintiff was not invited by EDA to submit any proposal; he was not encouraged to do so; EDA made no request for information. The proposal was a voluntary submission by plaintiff. As already noted, the request therein for government support of an increased quota was not unfamiliar to EDA, which had previously given its support to such applications. When plaintiff, seeking information about the quota restrictions, inquired of EDA through his friend Feliciano, the latter, in June 1961, conveyed Durand's suggestion that plaintiff file an application for a quota directly with the United States Secretary of the Interior to see what he could accomplish on his own, and that he, plaintiff, write Durand "a letter stating your problem and asking for the cooperation of the Commonwealth government on this matter." Neither the nature of the proposal that plaintiff thereafter submitted nor its contents created or required a confidential relationship between the parties. There was no basis for its submission in confidence;[13] it contained no matter that was original or that was not known to EDA. That plaintiff marked the letter "confidential" does not make its contents confidential

9. "A contract implied in law, or a quasi-contract, results in a situation where neither an express nor an implied contract is found. But there is such a situation between the parties that it would be inequitable (by virtue of breach of confidence or some similar ethical violation) for defendants to profit from the use of the idea and the material." Robbins v. Frank Cooper Assocs., 19 A.D.2d 242, 241 N.Y.S.2d 259, 261 (1st Dep't 1963), rev'd on other grounds, 14 N.Y.2d 913, 252 N.Y.S.2d 318, 200 N.E.2d 860 (1964).

10. E. g., Atlantic Wool Combing Co. v. Norfolk Mills, 357 F.2d 866 (1st Cir. 1966); Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953); Schreyer v. Casco Prods. Corp., 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); Matarese v. Moore-McCormack Lines, 158 F.2d 631 (2d Cir. 1946).

11. See Speedry Chemical Prods., Inc. v. Carter's Ink Co., 306 F.2d 328 (2d Cir. 1962); Restatement of Torts, § 757.

12. Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337 (1916).

13. Bristol v. E. L. A. Society, 132 N.Y. 264, 268, 30 N.E. 506 (1892). See also Galanis v. Procter & Gamble Corp., 153 F.Supp. 34, 38 (S.D.N.Y.1957); De Filippis v. Chrysler Corp., 53 F.Supp. 977 (S.D.N.Y.1944), aff'd, 159 F.2d 478 (2d Cir.), cert. denied, 331 U.S. 848, 67 S.Ct. 1733, 91 L.Ed. 1857, rehearing denied, 332 U.S. 786, 68 S.Ct. 34, 92 L.Ed. 369 (1947).

or original when in fact they were not.[14] So, too, that EDA had "a sort of an unwritten policy" not to disclose publicly proposals received under its program of economic development did not make such proposals confidential or original. In sum, neither the proposal nor any dealings between the parties prior or subsequent to its submission supports the claim of an implied in law contract.

This is no case of inequitable conduct or breach of confidential relationship or the use of ideas not previously known to the defendant. The Court is mindful of Arnstein v. Porter,[15] and not unaware of the admonition in Bozant v. Bank of New York.[16] However, the summary judgment rule still exists. A defendant should not be compelled to go through a full dress trial with its substantial expense where plaintiff has failed to offer probative evidence tending to support his claims.[17]

There being no basis for any claim against EDA, it necessarily follows that the suit against Phillips must also fail.

The motion for summary judgment is granted.

14. *Cf.* Smoley v. New Jersey Zinc Co., 24 F.Supp. 294 (D.N.J.1938), aff'd, 106 F.2d 314 (3d Cir. 1939).

15. 154 F.2d 464 (2d Cir. 1946).

16. 156 F.2d 787 (2d Cir. 1946).

17. *Cf.* First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Van Rensselaer v. General Motors Corp., 324 F.2d 354 (6th Cir. 1963), cert. denied, 377 U.S. 959, 84 S.Ct. 1640, 12 L.Ed.2d 502, rehearing denied, 379 U.S. 874, 951, 85 S.Ct. 26, 85 S.Ct. 435, 13 L.Ed.2d 82, 13 L.Ed.2d 549 (1964).