**Robert DARLING, d/b/a Darling Enterprises, Appellant,**

v.

**STANDARD ALASKA PRODUCTION COMPANY, Exxon Corporation, Union Oil Company of California, Amoco Production Company, Cook Inlet Region, Inc., Nana Regional Corporation, Inc., Doyon Limited and Arco Alaska, Inc., Appellees.**

No. S–3777.

Supreme Court of Alaska.

Oct. 17, 1991.

Mark A. Sandberg and Henry J. Camarot, Sandberg & Smith, Anchorage, for appellant.

John M. Conway and Craig F. Stowers, Atkinson, Conway & Gagnon, Anchorage, for appellees.

Before RABINOWITZ, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Robert Darling filed suit against the owners and operators of the Endicott Island production facility, claiming they had appropriated cinder blocks of his design in protecting against shore erosion. The superior court held that Darling's claim was preempted by federal patent law, and granted summary judgment against Darling. We affirm.

### I

Endicott Island is a forty-five acre artificial island, located in the Beaufort Sea, approximately fifteen miles from Prudhoe Bay. It was constructed for oil exploration and production. Construction of the island was completed in 1987.

The island and connecting causeway consist of nearly seven million cubic yards of gravel. The island is protected from erosion, waves, and polar ice by a shore protection system consisting of a mat of interconnected concrete blocks.

Robert Darling, a Fairbanks entrepreneur, designed and sold a system of linked concrete blocks, called Linkrete, for use in shore protection in arctic conditions. Darling believed that the owners of Endicott appropriated the Linkrete design from him without authorization or compensation. Darling filed suit for unjust enrichment against Standard Alaska Production Company, the operator and owner of the largest share of the project, and the other owners of Endicott ("Standard").

Darling first designed Linkrete in 1980. He asserts that he was contacted by Exxon and Sohio Alaska Petroleum Company ("Sohio"), Standard's predecessor, and in 1980 sold each of them samples of Linkrete for test purposes. Later, thinking that Exxon would be the operator of the Endicott project, Darling presented a seminar on Linkrete for Exxon's engineering firm.

When it became clear that Sohio would be the operator of the Endicott project, Darling communicated with the engineering firms of Ralph M. Parsons Company ("Parsons"), and Tekmarine, Inc. ("Tekmarine") and supplied them with information about Linkrete.[1] From August 21, 1984 to March 26, 1986, Darling's patent application was under consideration, and Darling notified Sohio that he had a patent pending on Linkrete. In 1984, when Sohio put the shore protection system up for bid, Darling informed Sohio that the system it had specified in its bid might infringe on his pending patent.[2] The parties seem to have assumed that Darling had rights in Linkrete, but apparently the subject never was discussed directly.[3]

---

1. Darling alleges that Parsons and Tekmarine were agents of Standard; Standard asserts that they were independent contractors. The decision of the superior court did not turn on this determination.

2. In March 1986, the federal patent office denied Darling's application, concluding that the purported design was obvious in light of existing technology.

3. For example, in a letter dated May 14, 1984, Darling wrote to Tekmarine stating that Linkrete would be marketed under a trade name, and that a patent was pending. The record also contains project notes prepared by Parsons summarizing a meeting with Darling on June 14, 1984. The meeting was attended by representatives of Parsons, Tekmarine, and Sohio. The project notes state that Linkrete was patented. Additionally, the record contains a letter of October 5, 1984 from Darling's patent attorney to

Standard never contracted with Darling for any aspect of the work on Endicott Island, or for any services related to Linkrete. The Endicott shore protection system was manufactured and installed by Tekmarine and Parson; Standard paid $520,353 for it.

Darling filed suit in superior court on January 22, 1988. Darling did not allege any tort or breach of contract. Rather, he sought both compensatory and punitive damages based on an unjust enrichment claim.

Standard moved for summary judgment and to strike Darling's demand for a jury trial. For the purposes of summary judgment, and thus, for the purposes of this appeal, Standard admits that Darling invented Linkrete, that Standard used Darling's Linkrete design in constructing Endicott Island and that Standard never compensated Darling.

After a hearing, the superior court granted summary judgment to Standard dismissing Darling's unjust enrichment claim on the ground that federal patent law precluded a suit for unjust enrichment based on an unpatented invention.[4] The superior court also granted partial summary judgment to Standard on Darling's claim for punitive damages, and granted Standard's motion to strike Darling's demand for a jury trial.

Darling appeals the superior court's grant of summary judgment as to his unjust enrichment claim, the grant of partial summary judgment as to punitive damages, and the denial of his demand for a jury trial.[5]

## II

Darling bases his unjust enrichment claim on "quasi-contract" or "contract-implied-in-law" theories. Unjust enrichment does not depend on any actual contract, or any "agreement between the parties, objective or subjective." *Alaska Sales and Serv., Inc. v. Millet,* 735 P.2d

Sohio, noting that the Invitation to Bid for shore protection for Endicott Island "indicates a preference for the shore protection system which comes within the scope of [the applied for patent]."

4. In its decision, the superior court stated:
It is undisputed that Plaintiff possessed no patent on his claimed invention of the shore protection system design. It is clear from the allegations contained in Plaintiff's Complaint and his other pleadings, and it is also clear from the evidence submitted, that Plaintiff's claimed shore protection system design was publicly known and publicly disclosed, and was so obvious that persons skilled in the shore protection art readily could have developed the Plaintiff's design. Under authority of *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); *Sears Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); and *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the court concludes that Plaintiff's claimed shore protection system design was in the public domain, and that Defendants were legally entitled to freely copy and use that shore protection system design. Because Defendants received nothing more than that which they were legally entitled to use, Defendants were not unjustly enriched.
The Court further concludes that Plaintiff's unjust enrichment claim is preempted under federal patent law and federal preclusion

principles as applied to the States by the Supremacy Clause of the United States Constitution. Therefore, Defendant's Motion to Dismiss Unjust Enrichment Claim is Granted. The court also awarded summary judgment on the alternative theory: "since the full value or value was paid, unjust enrichment cannot be obtained against the Defendants in this case."

5. The superior court filed findings of fact upon which it based its grants of summary judgment and partial summary judgment. However, these findings are not subject to deferential review. *Moore v. State,* 553 P.2d 8, 15 n. 3 (Alaska 1976). Rather, "the standard of review for summary judgment is to determine whether the moving party is entitled to judgment on the law applicable to the established facts." *Reed v. Municipality of Anchorage,* 741 P.2d 1181, 1184 (Alaska 1987). Our review is *de novo,* and we will "adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2. (Alaska 1987) (citations omitted).

If the grant of summary judgment depends on a finding of fact, we examine the record on appeal, and, viewing the facts in the light most favorable to the non-moving party, determine whether a material issue of fact exists regarding any of the predicate facts supporting the grant of summary judgment, and whether the moving party is entitled to judgment as a matter of law. *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274 (Alaska 1985).

743, 746 (Alaska 1987). In *Alaska Sales,* we noted that "unjust enrichment is not in and of itself a theory of recovery. Rather, it is a prerequisite for the enforcement of restitution; that is, if there is no unjust enrichment, there is no basis for restitution." *Id.* *Alaska Sales* identified three elements of a claim sounding in quasi-contract for unjust enrichment:

1) a benefit conferred upon the defendant by the plaintiff;

2) appreciation by the defendant of such benefit; and

3) acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for him to retain it without paying the value thereof.

*Id.* For purposes of this appeal, Standard does not dispute that it received a benefit from Darling and that it appreciated that benefit. Therefore, we must address whether considerations of equity will permit Standard to retain the benefit without compensating Darling.[6]

Federal patent law grants inventors limited protection from exploitation of their inventions by others. "The applicant whose invention satisfies the requirements of novelty, nonobviousness, and utility ... is granted 'the right to exclude others from making, using, or selling the invention throughout the United States' for a period of 17 years." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 150, 109 S.Ct. 971, 977, 103 L.Ed.2d 118 (1989) (quoting 35 U.S.C. § 154). Federal patent law recognizes two conflicting objectives. "The tension between the desire to freely exploit the full potential of our inventive resources and the need to create an incentive to deploy those resources is constant." *Id.* at 152, 109 S.Ct. at 978. The United States Supreme Court, however, has held that "free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception." *Id.* at 151, 109 S.Ct. at 978. Whatever unfairness inheres in allowing the free exploitation of ideas must give way to the greater societal benefit of achieving the full potential of our inventive resources, unless the federal government has granted the protection of a patent.

Under the supremacy clause of the United States Constitution,[7] federal patent law preempts state awards of patent-like protection. "[S]tate regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws." *Id.* at 152, 109 S.Ct. at 978. Thus, in *Bonito,* the United States Supreme Court struck down a Florida law which prevented manufacturers from copying an unpatented boat design. *See also Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) (state may not award damages based on unfair competition laws where Sears had merely copied the design of a lamp which was in the public domain and

---

**6.** Not all benefits conferred without compensation constitute unjust enrichment. For example, when benefits are "given gratuitously" and "without expectation of payment," courts will allow the recipient to retain the benefit without compensating the provider. *Sparks v. Gustafson,* 750 P.2d 338, 342 (Alaska 1988) (citing *Murdock–Bryant Constr. v. Pearson,* 146 Ariz. 48, 703 P.2d 1197, 1203 (1985)). In *Sparks,* however, we upheld a finding of unjust enrichment because the evidence showed no gratuitous intent on the part of the plaintiff. There, the plaintiff had provided various business services, which were not of the type "one would ordinarily expect to receive from a friend as a mere gratuity." *Id.* at 343.

Here, Darling alleged in his complaint that "[a]ll of the disclosures made by Mr. Darling to the defendants or their representatives were made with the expectation ... that Mr. Darling would receive monetary compensation were his system used." Darling did not act out of friendship; there is no dispute that the relationship between Darling and Standard was a business relationship. The mere existence of a business relationship, however, does not establish the element of injustice. "[C]ompensation [is not] mandated where the services were rendered simply in order to gain a business advantage." *Bloomgarden v. Coyer,* 479 F.2d 201, 211 (D.C.Cir.1973) (footnote omitted).

**7.** Article VI, clause 2 of the United States Constitution provides:

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land....

did not have the protection of a valid patent); *Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) (states may not prevent or impose liability for copying or selling copies of unpatented items). Significantly, in *Sears,* the designer of the lamp originally had been issued patents, but the patents were later held invalid due to the obviousness of the design. The Supreme Court recognized that denial of a patent had the same effect as expiration of a patent and placed the product in the public domain, allowing free exploitation. 376 U.S. at 231, 84 S.Ct. at 789.

However, not all forms of state protection are preempted by federal patent law. *Bonito* noted that *Sears* did not "prohibit the States from regulating the deceptive simulation of trade dress or the tortious appropriation of private information." 489 U.S. at 154, 109 S.Ct. at 979. *Kewanee Oil v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), held that state protection of trade secrets did not conflict with federal patent law. *Kewanee* further noted that trade secret laws protect rights, such as privacy, which are beyond the economic sphere and provide less monopolistic protection than patent law. *Id.* at 487, 94 S.Ct. at 1889. Moreover, patent law is not intended to protect "industrial espionage." [8]

Federal patent law does not necessarily prohibit states from enforcing valid contracts under state contract law when such contracts provide protection for unpatented products. *Bonito,* 489 U.S. at 156, 109 S.Ct. at 980; *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). In *Aronson,* Aronson had invented a unique keyholder and applied for a patent. Before the design was placed in the public domain, Aronson negotiated a royalty contract with Quick Point, which then began manufacturing the keyholders. After her patent application had been denied, and other manufacturers were free to copy the keyholder, Quick Point sued for a declaratory judgment that federal law preempted the enforceability of the contract. The Supreme Court held that parties may contract to pay royalties for an unpatented product which is not in the public domain, and that state courts may award damages for breach of such a contract.

■ Here, Standard asserts that *Sears* allows Standard to exploit Linkrete because Linkrete is in the public domain.[9] Darling distinguishes *Sears* and *Bonito* by arguing that his claim against Standard does not conflict with the policies underlying federal patent law.[10] Darling does not deny that anyone other than Standard could copy and use Linkrete with impunity. Nevertheless, Darling asserts that he is entitled to recover against Standard on the basis that they had a relationship and Standard used that relationship to unfairly exploit him.

Darling argues that *Aronson* is particularly supportive of his position because a cause of action in quasi-contract, like a cause of action in contract, only accrues when the parties have a relationship. Thus, Darling concludes, "[a]fter *Aronson,* it is clear that Darling and the owner companies could have validly contracted for the use of Linkrete. There is no reason that a claim in quasi contract should be treated differently." [11]

---

**8.** *Kewanee* additionally noted that state trade secret protection still allowed the public to exploit unpatented products in the public domain through reverse engineering or independent creation. *Id.,* 416 U.S. at 490, 94 S.Ct. at 1890.

**9.** The superior court found, and Darling does not dispute, that Linkrete was in the public domain.

**10.** Darling expressly disavows any recovery for the value of his services under a *quantum meruit* theory. He states in his brief, "Darling's claim does *not* sound in *quantum meruit*" (em-

phasis in original). Therefore, Darling's claim must stand upon his rights in intellectual property.

**11.** Whether Darling could in fact enforce a licensing agreement for the use of Linkrete is doubtful, given that Linkrete was in the public domain, and that Darling was relying on his patent application to protect his rights. *See Aronson,* 440 U.S. at 263, 99 S.Ct. at 1099–1100. Importantly, Darling had no contract; *Aronson* clearly rests on freedom of contract principles. *Id.* at 262–63, 99 S.Ct. at 1099–1100.

In urging that his claim against Standard is not contrary to the policies underlying federal patent law, Darling correctly notes that both *Kewanee* and *Aronson* allowed state law protection of intellectual property because the protection in those instances "was not offensive to federal patent policies." *Aronson*, 440 U.S. at 266, 99 S.Ct. at 1101. However, Darling fails to identify how enforcement of his claim would not offend federal patent policies. Federal policy both encourages disclosure of ideas and innovation and demands "substantially free trade in publicly known, unpatented [products]." *Bonito*, 489 U.S. at 156, 109 S.Ct. at 980; *see also Sears*, 376 U.S. at 231, 84 S.Ct. at 789; *Lear, Inc. v. Adkins*, 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969). Here, Darling voluntarily disclosed his idea without obtaining an agreement for compensation. In such circumstances, enforcement of Darling's unjust enrichment claim would clearly hamper free exploitation of ideas which are in the public domain, without affecting the existing incentives inventors have for disclosure. Those inventors who require assurance of compensation before disclosure might be affected by whether Darling has a claim in unjust enrichment. Yet, those inventors can already protect themselves by patent, contract, or trade secret. Those who voluntarily disclose without rending an assurance of compensation would be the only inventors affected by a ruling in Darling's favor. Therefore, it is unnecessary to rule in Darling's favor to further the federal policy of disclosure.

Finally, because Darling has not shown that his claim comports with federal policy, Darling cannot establish that any injustice has occurred. Federal policy discourages monopoly pricing unless a valid patent is in force. Here, Darling was seeking the right to charge Standard a price above that controlled by the free market. Unless federal policy requires otherwise, denying Darling this right does not create an injustice. In short, because Linkrete was in the public domain and because Darling asserted no basis for his claim other than injustice based on his disappointed expectations, we conclude that he failed to establish the elements of a claim for unjust enrichment.

We think it determinative that Darling relied exclusively upon his patent application for protection of his rights in Linkrete. This alone distinguishes this case from *Aronson*, where the inventor had sought protection by contract.[12] Here, Darling and Standard conferred about Linkrete with the

Moreover, *Aronson* does not support Darling's argument that the policies underlying federal patent law only apply against the world, and not to individual agreements. *Aronson* explicitly avoids overruling two previous cases, which disallowed enforcement of valid contracts that interfered with federal policy. *See Aronson*, 440 U.S. at 264–65, 99 S.Ct. at 1100–01, *citing Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) (if patent underlying royalty agreement is declared invalid, manufacturer need not pay royalties from time that it challenges validity of patent, even though required to do so by contract); *Brulotte v. Thys Co.*, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) (contractual obligation to pay royalties based on a patent may not be enforced beyond the life of the patent), *reh'g denied*, 379 U.S. 985, 85 S.Ct. 638, 13 L.Ed.2d 579 (1965). Both these cases refute Darling's contention that federal policy only operates to prevent state law enforcement of "rights against the world." Both cases also establish that the equities do not require enforcement of an inventor's contractual rights where those rights conflict with federal patent policy. *See, e.g., Lear*, 395 U.S. at 670, 89 S.Ct. at 1911 ("the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain."). In *Lear*, the equities in favor of enforcement were stronger than in the instant case, given the contract; yet, here, Darling must show inequity as a matter of law.

By reaffirming *Lear* and *Brulotte*, *Aronson* emphasizes the importance of a valid patent to protect rights in intellectual property. In *Aronson*, the contract survived because "the parties resolved the uncertainties by their bargain." 440 U.S. at 264, 99 S.Ct. at 1100. Darling, on the other hand, never resolved the uncertainties in his relationship with Standard.

12. Darling quotes *Matarese v. Moore–McCormack Lines*, 158 F.2d 631, 634 (2nd Cir.1946), for the proposition that "[t]he doctrine [of unjust enrichment] is applicable to a situation where, as here, the product of an inventor's brain is knowingly received and used by another to his own great benefit without compensating the inventor." *Id.* However, in *Matarese*, the manufacturer had made an explicit promise of compensation to the inventor. Moreover, the inventor later obtained a patent. The *Matarese* court noted the importance of this fact, stating

knowledge that Darling had applied for a patent. The record reveals that Darling sought no further protection of his alleged design, either contractual or promissory. Darling relied exclusively on his patent application to protect his rights. When the federal government denied Darling's patent, Darling's shore protection design was copyable by anybody who obtained the idea through legal and non-confidential means. In short, where an inventor applies for a patent on a product, and relies solely on that patent application to protect his or her rights, the inventor cannot obtain restitution for unjust enrichment from a party who copies and uses that product if the patent application is ultimately rejected.[13]

In conclusion, we hold that Darling has failed to present a genuine issue of material fact as to the third element of his unjust enrichment claim: whether it would be unfair to allow Standard to retain the benefits it obtained from Darling without compensating him.

### III

The superior court's grant of summary judgment dismissing Darling's claim for restitution based on unjust enrichment is AFFIRMED.[14]

BURKE, J., not participating.

that recovery in unjust enrichment would only exist if the plaintiff's idea was novel and created a property right. *Id.* at 634. Here, the denial of Darling's patent establishes that Darling had no property right in his design. Therefore, under *Matarese,* he cannot maintain a suit in unjust enrichment based on the exploitation of unprotected ideas.

**13.** We do not address whether federal patent law forecloses other causes of action surrounding the same course of dealing, e.g. fraud, misrepresentation, *quantum meruit,* or promissory estoppel. Darling has not plead any claims for relief grounded on these theories. Accordingly, the cases cited by Darling are distinguishable. *See Ocor Products Corp. v. Walt Disney Productions,* 682 F.Supp. 90 (D.N.H.1988) (unjust enrichment claim may rest on a breach of an express agreement not to copy a design; design was provided to defendant only upon defendant's promise not to copy and reproduce it); *Marcraft Recreation Corp. v. Frances Devlin Co.,* 459 F.Supp. 195 (S.D.N.Y.1978) (claim for *quantum meruit* may be based on value of technical services provided; here, plaintiff had also alleged a breach of contract based on an express agreement for exclusive merchandising); *Roberts v. Sears, Roebuck & Co.,* 471 F.Supp. 372 (N.D.Ill.1979) (following rescission of a fraudulently induced licensing contract, courts may award restitution based on the unjust enrichment of the fraudulent party), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1981).

Darling believes that the following statement from *Aronson* provides implicit support for his unjust enrichment theory: "[i]n negotiating the [license] agreement, Mrs. Aronson disclosed the design in confidence. Had Quick Point tried to exploit the design in breach of that confidence, it would have risked legal liability." 440 U.S. at 263, 99 S.Ct. at 1100. Here, Darling does allege in his complaint that defendants assured him that the information he provided in 1983 and 1984 would remain confidential. However, he admits that the earlier disclosures of Linkrete were made only with the subjective "expectation that he would receive compensation." His complaint does not allege a breach of confidentiality. Significantly, Darling's response to a perceived threat to his rights was a letter from his patent attorney invoking his patent rights. This letter does not mention promises, confidentiality, reliance, or other possible protection of his interests. Moreover Darling does not deny that Linkrete was in the public domain at the time that Standard built Endicott Island. These facts preclude recovery in unjust enrichment.

**14.** Given this holding, it is unnecessary to address Darling's remaining specifications of error.