Melvin **EPSTEIN**, Plaintiff,

v.

**DENNISON MANUFACTURING COM-PANY**, Defendant.

**No. 69 Civ. 3798.**

United States District Court,
S. D. New York.

Oct. 29, 1969.

Edward B. Hunter, Nolte & Nolte, New York City, for plaintiff.

Harold James, James & Franklin, New York City, for defendant.

MOTLEY, District Judge.

This action was instituted by plaintiff, Melvin Epstein, the owner of Patent 2,952,851 of September 20, 1960, entitled "Self-Loading Fastener Means", relating to a device for attaching tags to garments. The case consists of three causes of action, one for patent infringement, one for breach of a confidential disclosure agreement, and one for misappropriation of property rights.[1]

Defendant, Dennison Manufacturing Company, counterclaimed for a declaratory judgment that the plaintiff's patent is invalid and not infringed.[2] As to the remaining causes of action, defendant denied the essential allegations, claimed independent development of its device, and alleged both causes of action are barred by the applicable statute of limitations in that they did not accrue within three years next before the commencement of this action in December 1965.[3]

Plaintiff demanded a trial by jury on all three causes of action. However, the ultimate question of patent validity is one of law for the court, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and the issue is tried to the court, alone, where, as here, plaintiff relies on the prior art samples cited by defendant (Pretrial Order, p. 10) and there are no real factual disputes as to the scope and content of the prior art, the differences

1. The complaint originally contained five causes of action. The original third cause of action for anti-trust violation was stricken by order of Judge McMahon, December 8, 1966. The fifth cause of action for false patent marking was dropped by plaintiff (T. 5). Jurisdiction in the first cause of action is predicated upon 28 U.S.C. § 1338(a) and the other causes of action are predicated upon diversity of citizenship, 28 U.S.C. § 1332 (a) (1) and (c). Plaintiff is a citizen of New York. Defendant is a Nevada corporation. All of its dealings with plaintiff relate to its place of business in Massachusetts.

2. In this connection defendant also sought damages on the ground that plaintiff's activities charging defendant with in-

fringement have damaged defendant to an amount in excess of $25,000. There was no proof offered on this claim.

3. Defendant relied upon New York Civil Practice Law and Rules § 214, subd. 4 which provides: "The following actions must be commenced within three years: * * * 4. an action to recover damages for an injury to property." This may be applicable to the third cause of action but not to the second cause of action. The latter would be governed by C.P. L.R. § 213, subd. 2 (McKinney's Supp. 1969) upon which plaintiff relies and which provides: "The following actions must be commenced within six years * * * 2. an action upon a contractual obligation or liability express or implied * * *."

between the prior art and the single claim at issue, and the level of ordinary skill in the prior art. (Pretrial Order, p. 19.) The trial was bifurcated, upon motion of defendant, with only the issues of liability being determined upon the instant trial.

At the end of the plaintiff's case, defendant moved for a directed verdict in its favor on each cause of action. The motion was granted as to the first cause of action. The court concluded that the first claim of plaintiff's patent, which he alleged defendant had infringed, is invalid on the ground that it plainly fails the test of non-obviousness prescribed by the 1952 Patent Act. 35 U.S.C. § 103. Graham v. John Deere Co., *supra*. The motion for a directed verdict was denied as to the other causes of action.

At the close of all the evidence, defendant renewed its motion for a directed verdict as to the remaining causes of action. That motion was denied and the case went to the jury on certain disputed issues of fact. The court required a special verdict of the jury in the form of Yes or No answers to written interrogatories. Rule 49(a), Fed.R.Civ.P. The jury answered some questions in plaintiff's favor and others in defendant's favor.

After the jury returned its answers, defendant moved for judgment notwithstanding the verdict on the ground that there was no evidence to support the jury's answers to certain questions in plaintiff's favor and for judgment in defendant's favor in accordance with certain other answers in its favor. Those motions are now granted.[4]

### Findings of Fact and Conclusions of Law

In 1958 plaintiff was employed, and had been for many years, by his father-in-law in Wilnat Stores, located in the New York City area which sold, among other things, women's and children's garments. In connection with his employment, plaintiff undertook to speed the process of ticketing, i.-e., attaching tags (with price and inventory data) to the merchandise by assisting those employees who had this specific task. He discovered that the process was a slow one because the needle device which was being used for attaching tags to garments was capable of holding only one cotton string attachment at a time. The needle device being used was manufactured by defendant. It was called a Bar-Lok Attacher. (Plaintiff's Exh. 1B.) The cotton string attachment which was used to attach the tag to the garment was also manufactured by defendant. It was called a Bar-Lok. (Plaintiff's Exh. 1C.) Defendant had been in the business of manufacturing and distributing tag attacher devices and tag attachments for more than 30 years. Plaintiff concluded that if the Bar-Lok Attacher could be designed in such a way as to contain a number of Bar-Loks and could dispense them, automatically, one at a time, this would greatly speed the tag attaching process. (T. 56–57, 61.)

After toying with the idea, in about June, 1958, plaintiff added to the needle of the Bar-Lok Attacher, in a lateral position, a magazine designed to hold a multiplicity of Bar-Loks. (Plaintiff's Exh. 3A.) This magazine was about $2\frac{1}{2}$ inches long and $\frac{3}{4}$ of an inch wide and about $\frac{1}{4}$ of an inch thick. At one end was a slot almost $\frac{3}{4}$ of an inch in length and only wide enough to accommodate the thin metal bar of a Bar-Lok. (Plaintiff's Exh. 1C.) There was another slot in the middle of one side of the magazine which extended its entire length. (Plaintiff's Exh. 3A.) Its purpose was to permit the cotton string on each Bar-Lok to dangle freely. The

---

4. The court grants defendant's motion with respect to the jury's answers to questions 5 and 12 discussed *infra*. After the trial, plaintiff moved to reinstate the affirmative answer of the jury to the first question in the series submitted to it which was changed to a negative answer by the jury after the court pointed out to the jury that its answer to the first question was inconsistent with its answer to the third question. That motion is denied and will be discussed *infra*.

string was tied to the center of each metal bar. On the opposite end of the string was a small cardboard button. (Plaintiff's Exh. 1C.) However, the thin metal bars at the top of each Bar-Lok were unevenly cut and, as a result, some of the bars would jam in the magazine as they were being pushed along by a spring urged slide which plaintiff's device contemplated. The slide was made of metal and matched in width the slot at the end of the magazine and approximated the length of the magazine. Its function was to urge the bars forward, so that the lead bar would fall into the bore of the needle and in line with the plunger. In addition to the bars jamming, another problem plaintiff encountered in trying to operate his home made device stemmed from the fact that the cotton strings would become entangled one with the other as the Bar-Loks were being urged through the magazine. (T. 70–71, 82, 121–122.)

Defendant's Bar-Lok Attacher was a very simple needle device for attaching tags to garments. It consisted of a hollow tubular handle from which a needle extended. The needle contained a bore extending rearwardly from its tip into which the thin metal bar of a Bar-Lok was inserted. The string of the Bar-Lok extended through a slot in the needle. The handle carried a plunger in line with the bore and an actuating button connected to the plunger by a small spring. Before a Bar-Lok was inserted in the needle bore, the plunger was retracted by retracting the button. After the Bar-Lok was inserted, the needle was passed through a hole in a tag and then through the garment. Next, the actuating button was moved forward, pushing the plunger into the needle bore and ejecting the thin metal bar of the Bar-Lok from the needle. Thereafter, the needle was withdrawn from the fabric, leaving behind the ejected metal bar. The cotton string of the Bar-Lok and the tag would remain on the opposite side of the fabric. At the bottom end of the string was this small cardboard button which prevented the tag from falling off as this button was larger than the hole in the tag.

Plaintiff applied for a patent on his model (Plaintiff's Exh. 3A). But since plaintiff had neither the money nor the requisite facilities to overcome the problems which he encountered in using a multiplicity of Bar-Loks in his device, he turned to defendant. (T. 63–64).

In December 1959, Matthew Clarke, the merchandise manager at Dennison, met with plaintiff at the Wilnat Stores offices in New York City. Mr. Clarke was accompanied by Joe McKnight, another Dennison employee who had previously met with plaintiff and made the arrangements for Mr. Clarke to visit plaintiff in New York. (T. 78–80.) Mr. Clarke worked at the Dennison plant in Framingham, Massachusetts. There is no dispute that at this meeting plaintiff demonstrated his model and then gave it to Clarke. Clarke took the device back to defendant's plant in Massachusetts for study by its engineering department. (T. 80, 82–83.) After about a month or more, plaintiff's model was returned to him. (T. 84, 109–110.) There is also no dispute that at this meeting modification of the existing Bar-Loks was discussed, with plaintiff suggesting that perhaps they could be lacquered together somehow like staples. (T. 82, Def's Brief Re Motion For Judgment, N.O.V. p. 8–9.) What is disputed is whether defendant used plaintiff's model in developing its new attacher and whether defendant used plaintiff's idea for attaching the existing Bar-Loks together in developing its new attachments. Plaintiff also claimed and defendant denied that he also gave defendant other ideas which it used in developing its new attacher not shown in plaintiff's model or described in plaintiff's patent, i. e., the idea for a rachet wheel or rachet feed. Finally, plaintiff claimed and defendant denied that he gave defendant the idea for making Bar-Loks out of plastic attached together as they are at present. (T. 72.)

At the time Clarke visited plaintiff, his patent application, filed on June 3,

1959 was pending but did not issue until September 20, 1960.

Thereafter, there was one other meeting between plaintiff and Mr. Clarke and one or two other Dennison representatives in 1961. (T. 94.) At this meeting, plaintiff testified, he exhibited a small oblong piece of plastic with pencil lines indicating how the piece could be sliced down to create individual Bar-Loks attached together as they are now. (Plaintiff's Exh. 5A.)

Plaintiff also received two letters from defendant. One was dated September 1, 1960. (Plaintiff's Exh. 5.) It advised plaintiff as follows:

"When you loaned me your Attacher model for evaluation, I told you the attachment modification would present quite a problem. That was the understatement of the year. To date, we have tried several approaches ourselves in addition to enlisting the aid of two outside consulting firms. Every approach has hit a 'stone wall'. All we can do is keep working and hope the 'stone walls' will crumble. If we come up with a solution, I'll let you know immediately, but remember that it is impossible to put a time schedule on invention.

"Incidentally, you told me your idea was patented. Can you tell me the number or something to identify it so we can complete the package if and when we find a solution to our attachment problem?

Sorry I can't report greater progress. I'll keep you up to date on any new developments either personally or through Joe."

The second letter was dated April 5, 1961. (Plaintiff's Exh. 6.) This time defendant advised the plaintiff:

"We have been moving fairly fast on the development of a semi-automatic Bar String Button attacher. As a result of heavy pressure on our Engineering Department, we plan to exhibit the first engineering model of an attacher design in New York during the week of April 10. We will be ex-hibiting this unit at the N.R.M.A. Traffic Conference to be held in the Hotel Biltmore. There are several production problems to be ironed out before we freeze our final design but if all goes well, the model should be in operating order for this show.

"Until the final design is completed and frozen for production we will have no way of knowing whether or not the concepts of your patent can be incorporated. Perhaps I will have an opportunity to talk with you during this show. I suggest you contact Joe McKnight to arrange a visit to our display booth."

Plaintiff could not remember whether he forwarded the number of his patent to defendant. (T. 98.) The patent had not yet issued. (T. 99.) Plaintiff testified he did not attend the exhibit on April 10, 1961 because he "heard", he believed, from Joe McKnight that the model would not be shown. (T. 182.)

Thereafter, from September 11, 1961 until May 23, 1962, a series of letters were written to Dennison by plaintiff's attorney and a series of replies were received by the attorney from Dennison's lawyers. (Plaintiff's Exh. 14, 14A–14I, 14L.)

Plaintiff testified that it wasn't until late 1964 or early 1965, that he learned for the first time that Dennison had on the market a successful device for automatically and successively dispensing a multiplicity of nylon Bar-Lok attachments for attaching tags to garments. (T. 105, 112.) But on December 28, 1961, one of Dennison's engineers, Arnold R. Bone, applied for a patent on a tag attaching device which issued on September 17, 1963 (Plaintiff's Exh. 15). The patent referred to the development of attachments to be used in the device and for which an application for patent was pending by another Dennison employee, Francis Mercer. The Bone patent was assigned to Dennison. (T. 118.) His device is called the Swiftacher. (Plaintiff's Exh. 17.) The new Bar-Loks, for which credit is given to

Francis Mercer, are called Swiftachments. (Plaintiff's Exh. 22.) They contain the same parts as the old Bar-Lok except that they are all made of nylon. A multiplicity of Swiftachments is capable of being fed into the Swiftacher and ejected therefrom, individually, successively, and automatically through the bore of the needle of the Swiftacher. Again, this is accomplished through the activation of a spring urged plunger which comes in line with the plastic bar of the Swiftachment as it rests in the bore of the needle. The Swiftacher resembles the common hand hole puncher which will punch holes in a piece of paper when the handles of the puncher, which are attached to a common spring, are squeezed together. (Plaintiff's Exh. 17.) When the handles of the Swiftacher are similarly squeezed together, being joined by a common spring, the plunger in the needle, located at the apex of the handles, moves forward and the thin nylon bar of the Swiftachment is pushed through the bore of the needle. The needle of the Swiftacher is first inserted through the hole in the tag and then through the garment in the same manner and with the same result as with Dennison's former Bar-Lok Attacher. The Swiftacher contains on its top handle two slots in a "T" formation. (Plaintiff's Exh. 17.) These slots are designed to accommodate the common nylon strip to which is attached, with a small space between each, a multiplicity of Swiftachments via the thin connector bar called the neck. The necks are attached to the common strip at even intervals and to the top bar of each Swiftachment. (Plaintiff's Exh. 22.) As the common strip and the neck piece pass through the T shaped slot, the neck is engaged by a tooth of a rachet wheel in the body of the Swiftacher behind the needle. The neck is cut from the strip and the strip is simultaneously pulled down through the slot and the next Swiftachment is pulled into place. The teeth of the rachet wheel also operate to keep the Swiftachments separated from each other and thus prevent jamming as each tooth is geared into position between each neck.

The problems which plaintiff encountered with the use of old Bar-Loks in his model were thus resolved by defendants by the following: 1) the use of nylon, a form of plastic, in making its new Bar-Lok attachments; 2) the common nylon connector strip; 3) the little nylon neck which connects each Swiftachment to the common strip; 4) a knife-like part which cuts each neck piece as it passed through the Swiftacher; 5) a rachet wheel, the teeth of which engage the common strip and a neck and permit the Swiftachments to feed only one at a time into the ejection zone.

Plaintiff's device for which he received a patent consists of two major operating ideas. The first part consists of a slotted needle extending from a handle. The other part of the device consists of a magazine with a spring mounted slide extending laterally from the needle with a slot therein along one slide and communicating with the slot in the needle. The magazine of plaintiff's device is basically the same as that of the well known stapler for which a patent existed, (Plaintiff's Exh. 21, Vogel '466), and is similar to the magazine which appears in a prior Dennison tag attaching device for which there was also a patent. (Plaintiff's Exh. 21, Flood '878).

The 1952 Patent Act sets out the conditions of patentability in three sections. 35 U.S.C. §§ 101, 102, 103. Patentability is dependent on three explicit conditions: novelty, utility, and nonobviousness. The test of nonobviousness is the most crucial and provides the more practical test of patent validity. Graham v. John Deere Co., *supra*, 383 U.S. at 17, 86 S.Ct. 684. Under this test, the court is to consider the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. *Id.* at 17, 86 S.Ct. 684. Thus, in order for plaintiff to prevail, the differences between the prior art and the subject matter of the Epstein

claim would have to be nonobvious to a hypothetical mechanic chargeable with knowledge of the prior art at the time Epstein developed his device. The only difference between plaintiff's magazine and the magazine of a stapler is that plaintiff's magazine has an additional slot along one side for the strings to pass. The only difference between plaintiff's needle part and defendant's Bar-Lok Attacher which, admittedly, was used in describing plaintiff's claim in suit (T. 324, 685-6) is that plaintiff's needle is slotted. But such a slotted needle is shown in an earlier Dennison Attacher. (Plaintiff's Exh. 21, Flood '878.)

Thus, after a review of the prior art references, relied upon by both plaintiff and defendant, none of which were cited by the Patent Office, thereby weakening the statutory presumption of patent validity,[5] Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536, 539 (2d Cir. 1966), the court finds and concludes that the Epstein claim in suit is invalid for lack of invention over the prior art in that it clearly fails to meet the test of nonobviousness. Graham v. John Deere Co., *supra*.[6] There were other prior art patents introduced in evidence which rendered plaintiff's device patently obvious. (Plaintiff's Exh. 21.) Several of these prior art samples are prior patents owned by defendant and similarly relate to devices for attaching tags to garments.

Only one other prior art patent of defendant is particularly worthy of note, i.e., the Flood '726 patent. This patent discloses a structure in which pins which resemble the bars of Bar-Loks are urged laterally through an elongated magazine chamber by a spring-mounted slide, after which they are successively forced longitudinally out through the bore of a needle by a reciprocal plunger. If Bar-Loks were used, the bars would move down one by one to a position in line with the plunger with the strings attached to those bars passing out through the slot in the magazine. (T. 778-779.) The feeding of the pins in the Flood '726 and the feeding of the bars in the Epstein patent are the same insofar as Claim 1 of the Epstein patent is concerned. (T. 829-30.) The only thing that would have to be done to the Flood '726 attacher to permit Bar-Loks to be ejected therefrom rather than pins, is to cut a slot in the side of the bore through which the pins are ejected to provide clearance for the passage of the strings. It would be an obvious expedient for any mechanic, let alone one specially skilled in the art of tag attaching devices, to provide a slot where he had to leave space for something to move (T. 792-3). No such simple expedient was ever thought to rise to the level of invention.

Plaintiff claims that in violation of a confidential disclosure agreement between them, defendant used his ideas embodied in his model in developing the present Swiftacher. He testified that the idea of rachet feed or a rachet wheel found in the present Swiftacher came from him. (T. 82, 87.) He further testified that defendant used his ideas for modifying the existing Bar-Loks by making them out of plastic and attaching them together as they are now. (T. 96-97.) Finally, plaintiff testified that defendant agreed, orally, to compensate him if it used his ideas. (T. 243-254.) Plaintiff testified that he gave defendant his ideas and that the agreement to compensate was reached at the December 1959 meeting prior to the issuance of his patent.

Defendant does not deny that plaintiff gave its representative, Mr. Clarke, plaintiff's model and that at the December 1959 meeting plaintiff suggested lacquering the existing Bar-Loks together like staples. What defendant denies is that it used plaintiff's model in any way in developing its new tag attaching device or that it used plaintiff's idea regarding the

---

5. 35 U.S.C. § 282.

6. The prior art references were introduced and received in evidence on plaintiff's case. (Pl's Exh. 21.)

existing Bar-Loks, i.e., that they might be lacquered together. Mr. Clarke denied that plaintiff suggested anything other than the lacquering together of Bar-Loks like staples (T. 1418). However, he did testify that he agreed that plaintiff would be compensated if Dennison used any part of his model (T. 1337, 1408). Dennison denied that it used any of plaintiff's ideas and put on testimony to prove independent development.

In view of the foregoing disputed facts, after receiving counsel's suggestions in writing and orally, the court submitted 14 questions to the jury in an effort to resolve the disputed issues and provide a basis for applying the law to the facts found. The following questions were submitted and the following answers given:

"1. Did Mr. Epstein give Mr. Clarke an idea for using plastic attachments attached together in substantially the same way as they now appear as Swiftachments (Plaintiff's Exh. 22) at their meeting in December 1959? Answer Yes ☐ or No ☒.

2. If the answer to question 1 is yes, was there an oral agreement between Mr. Clarke and Mr. Epstein to compensate Mr. Epstein for such idea? Answer Yes ☒ or No ☐.[7]

3. Did Mr. Epstein give Dennison an idea in December 1959 for using Bar-Lok attachments attached together which is different from the present plastic Swiftachments but which Dennison nevertheless used in developing its present plastic Swiftachments? Answer Yes ☒ or No ☐.

4. If the answer to question 3 is yes, was the idea for using such Bar-Lok attachments in such manner new and original to Dennison at the time? Answer Yes ☒ or No ☐.

5. If the answer to question 3 is yes, was there any oral agreement between the parties to pay or compensate Mr. Epstein for his idea? Answer Yes ☒ or No ☐.

6. Did Mr. Epstein give Mr. Clarke an idea for using a rachet wheel or rachet feed which is substantially the same as that now found in the Swiftacher at their meeting in December 1959? Answer Yes ☐ or No ☒.

7. Did Mr. Epstein give Dennison an idea for using a rachet wheel or rachet feed which is substantially the same as that now found in the Swiftacher at anytime before Dennison built its first model of an attacher using a rachet wheel or rachet feed? Answer Yes ☐ or No ☒.

8. If the answer to question 6 or 7 is yes, was there an oral agreement between Mr. Epstein and Mr. Clarke or anyone at Dennison to compensate Mr. Epstein for such idea? Answer Yes ☐ or No ☒.

9. If the answer to question 6 or 7 is yes, was the idea of using such rachet wheel or rachet feed new and original to Dennison at the time Mr. Epstein told Dennison about his idea for using a rachet system? Answer Yes ☐ or No ☒.

10. Did the Dennison Company use any of the major operating ideas embodied in Mr. Epstein's model in developing the Swiftacher? Answer Yes ☒ or No ☐.

11. If the answer to question 10 is yes, were the major operating ideas which Dennison used and which were embodied in Mr. Epstein's model new and original to Dennison at the time it used Mr. Epstein's model? Answer Yes ☒ or No ☐.

12. If the answer to question 10 is yes, did the Dennison Company save any time or money in developing the Swiftacher between December 1959 when it received Mr. Epstein's model and September 1960 when Mr. Epstein's patent issued, which gave Dennison an advantage over its competi-

---

7. When the jury changed its answer to question 1 to the negative, the answer to question 2 was automatically eliminated.

tors in the tag attaching field? Answer Yes ☒ or No ☐.

13. If the answer to 10 is yes, did the Dennison Company orally agree to pay or compensate Mr. Epstein if it used any of the new or original major operating ideas embodied in Mr. Epstein's model? Answer Yes ☒ or No ☐.

14. Did the Dennison Company orally agree in December 1959 to pay or compensate Mr. Epstein only if it used his patent? Answer Yes ☐ or No ☒."

■ The jury first answered question 1 in the affirmative as well as question 3. The purpose of questions 1 and 3 was to resolve the issue whether, in December 1959, plaintiff had given to defendant the idea for making Bar-Loks out of plastic attached together substantially as they are now, as he claimed (which idea defendant obviously used in making its present Bar-Loks) or whether the only idea given by plaintiff to defendant was that the existing Bar-Loks might be lacquered together like staples, as defendant contended, but which (contrary to defendant's contention) defendant nevertheless used in developing its present Swiftachments. (T. 1913–1922.) When the jury returned with both answers in the affirmative, because they obviously had not understood that this was the issue as the court had instructed them (T. 2051–2052) the court advised the jury that their answers were inconsistent and asked them to return to the jury room to resolve the inconsistency. The jury then answered the first question in the negative. The answer to the second question then became superfluous. Prior to submitting the questions to the jury, the parties were on notice that any inconsistencies in the answers would be sent back to the jury for resolution (T. 1909). Cf. Rule 49(b), Fed.R.Civ.P.

After the trial, plaintiff moved for reargument and reconsideration of the court's determination to resubmit to the jury questions numbered 1 and 3 "based upon the Court's determination that such questions [sic] were inconsistent and for a ruling reestablishing the affirmative answer of the jury to question number 1." [8] That motion is denied for the reasons set forth above.

The Supreme Court in the recent decision of Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) has dealt with the difficult problem of the extent to which federal patent law and policy bars a state from enforcing a contract regulating access to an unpatented secret idea. In that case an inventor had negotiated a licensing and royalty agreement with a corporation four years prior to the issuance of a patent on his device by virtue of which he claimed the right to royalties regardless of the ultimate validity of his patent. The court there held that the corporation must be permitted to avoid payment of all royalties accruing after the issuance of the patent if the corporation could prove patent invalidity. The court, however, declined to rule on the extent to which, if any, the states might properly act to enforce the contractual rights of inventors of unpatented secret ideas, in order to give state courts an opportunity first to reconcile the competing demands of patent and contract law. Three Justices, on the other hand, concurring in part and dissenting in part, expressed the view that "private arrangements under which self-styled 'inventors' do not keep their discoveries secret, but rather disclose them, in return for contractual payments, run counter to the plan of our patent laws which tightly regulate the kind of inventions that may be protected and the manner in which they may be protected." (Mr. Justice Black) 395 U.S. at 677, 89 S.Ct. at 1914. This court has not found any reported New York case on this question since the

---

8. The court obviously resubmitted the questions to the jury because the answers were inconsistent and not because the questions were inconsistent.

*Lear* decision which was handed down after trial and submission of briefs. Although the *Lear* case was brought to the court's attention by defendant, neither party has brought any recent New York case to the court's attention.

However, the law in this Circuit, long prior to Lear, was that possessors of trade secrets or secret ideas could have limited recovery for the wrongful use of their ideas prior to issuance of their patents. They could recover such damages as could be proved resulted from the wrongdoer getting to the market sooner (or gaining some advantage over his competitors) than would have been possible had the wrongdoer waited for the issuance of the patent. Schreyer v. Casco Products Corp., 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2d Cir. 1949); Tempo Instrument, Inc. v. Logitek, Inc., 229 F.Supp. 1 (E.D.N.Y.1964). See, Speedry Chemical Products, Inc. v. Carter's Ink Co., 306 F.2d 328, 331 (2d Cir. 1962). Accordingly the jury was asked to answer question 12, *supra,* which it answered in the affirmative.

█ The court now grants defendant's motion for judgment notwithstanding the verdict with respect to the jury's answer to question 12 on the ground that the record contains no evidence from which the jury could reasonably have found that defendant saved any time or money as a result of the disclosure of plaintiff's model to it prior to September 20, 1960, when the plaintiff's patent issued. On the contrary, the evidence is undisputed that plaintiff's model did not work well with the existing Bar-Loks and that a modification of same was required, necessitating the expenditure of considerable time, money and effort in making and perfecting both the Swiftacher and the Swiftachments which finally came to commercial status in early 1965 (T. 105, 112, 1420, 1493–1518, 1648–1671, 1752–1754, 1767–1781, 1829–1830). Moreover, there was evidence that a competitor of defendant was on the market with plastic attachments long before defendant's product reached commercial status (T. 1756–1760).

The Swiftacher admittedly contains a rachet wheel or rachet feed which plaintiff's patent did not contain and the idea for which the jury found did not come from plaintiff, as he claimed. The rachet wheel is a crucial and substantial difference between plaintiff's model and the present Swiftacher, described above. The present plastic Swiftachments are substantially different from the old Bar-Loks lacquered together which plaintiff had suggested and required a great deal of work to perfect (T. 1493–1518). This, consequently, is not a case where what was given to defendant was a completed working model of both the attacher and attachments which did not require any extensive development or refinement and from which the jury might infer time or money saved. See, e.g., Schreyer v. Casco Products Corp., *supra*; Matarese v. Moore-McCormack Lines, 158 F.2d 631 (2d Cir. 1946); Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4th Cir. 1936). Proof of the kind offered in other cases to prove that defendant gained some advantage or saved time or money was, therefore, required. See, e.g., Matarese v. Moore-McCormack Lines, *supra*; Hoeltke v. C. M. Kemp Mfg. Co., *supra*. None was offered by plaintiff here. As a matter of fact, there was proof that another company had on the market plastic attachments before defendant's appeared on the market. (T. 1756–1760.) Since there was no such proof of advantage to the defendant as required, judgment must be entered for defendant notwithstanding the verdict. O'Connor v. Pennsylvania Railroad Co., 308 F.2d 911 (2d Cir. 1962).

The court also grants defendant's motion for judgment n.o.v. in regard to Epstein's disclosures about modification of the existing Bar-Loks. The jury found that plaintiff gave defendant an idea for using Bar-Loks attached together

which is different from the present plastic Swiftachments but which Dennison nevertheless used in developing its present plastic Swiftachments. [Question 3.] The jury also found that this idea was new to Dennison at the time and that there was an oral agreement between the parties to pay or compensate plaintiff for this idea [Questions 4 and 5]. It is this last finding regarding an oral agreement which is totally without basis. Giving plaintiff every favorable inference from the evidence, the court can find nothing in the record which can substantiate this finding. O'Connor v. Pennsylvania Railroad Co., *supra*.

Plaintiff's own testimony on the issue of a compensation agreement, in response to a question by his attorney, was as follows:

"Q. Was there any mention of compensation at all at the meetings you had, that you have thus far described with Dennison Manufacturing?

"A. No. There was no actual dollars and cents, in other words, where we discussed it in terms of how much money, but naturally I inferred that I wanted to be paid if and when they came in to manufacturing *that* if there was to be some payment made.

What it was wasn't discussed, whether it was five or ten or whatever, but just the *fact that I hoped to be paid for my idea.*" (T. 83–84) (Emphasis added).

It is clear from the testimony preceding this excerpt that plaintiff's references to manufacturing "that" and "my idea" both refer to the model. Later plaintiff was questioned on cross examination regarding what was said about terms of payment. His response was, "just the feeling that I would be paid for my ideas should they decide to use them." (T. 248–249.) Mr. Clarke, the Dennison representative who met with Mr. Epstein, gave no support to the ex-

istence of any agreement between the parties other than to compensate Mr. Epstein for use of his model, (T. 1337, 1407–08.) The testimony of plaintiff's own attorney regarding a subsequent meeting between plaintiff, the attorney, and Clarke in 1961 also makes clear that the talk of compensation related only to plaintiff's model. Plaintiff's attorney testified that at this meeting Mr. Clarke said: "He couldn't speak of remuneration with him [plaintiff] because they weren't at a point where they knew they would be making use of his patent or not." (T. 1486.) The jury, possibly, may have confused testimony regarding plaintiff's model with testimony regarding disclosures in addition to the model, but the record must control.

■ In order for plaintiff to recover for misuse of a confidential disclosure without the existence of an express contract that disclosure must be specific. The disclosure must be in sufficient detail and have such definiteness that there is no doubt as to what is disclosed. The idea should be such that it could be utilized without any substantial further development or research on the part of the recipient. In short, the idea must be concrete. Plus Promotions, Inc. v. RCA Manufacturing Co. Inc., 49 F.Supp. 116 (S.D.N.Y.1943); Williamson v. New York Central R.R., 258 App.Div. 226, 16 N.Y.S.2d 217 (1939); Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc., 333 F.2d 672, 675 (5th Cir. 1964) (Rives, J., concurring). Whenever recovery has been allowed for misappropriation of ideas disclosed in confidence and without an express agreement, the disclosure has been in concrete form. Schreyer v. Casco Products Corp., 97 F.Supp. 159, 167 (S.D. N.Y.1951), aff'd 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S. Ct. 360, 96 L.Ed. 683 (1952). *Accord*, Smith v. Dravo Corp., 203 F.2d 369 (7th Cir. 1953); Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912 (4th Cir. 1935), cert. denied, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936).

The court now holds that the unpatented idea given by plaintiff to defendant in connection with his model in December 1959 for using Bar-Loks attached together which is different from the present Swiftachments, but which the jury found defendant nevertheless used, was not concrete enough to be protectable. Plaintiff, himself, testified it was just a "possibility" which he did not believe as good as the idea of using plastic. Plaintiff's total testimony on this score was as follows:

"There was a possibility that maybe these could be lacquered together in a clip form, again as staples are made, but frankly I thought the best route to go would be in plastic, injection molded, where you could control the members without any problem." (T. 82, 187.)

Then, when asked why he didn't say anything about the use of plastic attachments in his patent application, plaintiff testified:

"It wasn't perfected. How could I state something in the patent that wasn't a completed thing? It was just a thought, a sketch, a scribble. I had no way of manufacturing it." (T. 193–194.)

The jury, of course, decided that plaintiff had not given defendant an idea for using plastic attachments attached together in substantially the same way as they now appear as Swiftachments at the December 1959 meeting (See answer to Question 1). Since plaintiff clearly testified that in 1959 he showed Dennison neither drawings, nor models—indeed, nothing physical or written—with respect to his idea for modifying Dennison's bar-string button attachments (T. 189, 338–346), there is nothing for a damages jury to use for determining the reasonable value of plaintiff's idea.

For all of the foregoing reasons, judgment must be entered for defendant.

Settle order on notice.